IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CARNEGIE MELLON UNIVERSITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| UBER TECHNOLOGIES, INC., UBER | ) | **JURY TRIAL DEMANDED** |
| FREIGHT HOLDING CORPORATION, | ) | |
| TUPELO PARENT, INC., UBER FREIGHT | ) | |
| LLC, AND UBER FREIGHT US LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF CARNEGIE MELLON UNIVERSITY'S
COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Carnegie Mellon University ("Plaintiff" or "CMU") brings this action for patent

infringement under 35 U.S.C. § 271 against Defendants Uber Technologies, Inc. ("Uber"), Uber

Freight Holding Corporation, Tupelo Parent, Inc., Uber Freight LLC, and Uber Freight US LLC

(collectively, "Defendants") and alleges as follows:

**PARTIES**

1.      Since its founding in 1900, CMU has been a birthplace of innovation. CMU was

the first University to institute a robotics department and the first in the United States to award a

degree in drama. CMU faculty and alumni have brought groundbreaking technologies like Java,

Kevlar Fiber, and Duolingo to market. For over a hundred years, CMU has been where ideas

become innovations and problems find real-world solutions.

2.      This pursuit of excellence has garnered CMU widespread recognition for its

technology and arts programs, collaboration across disciplines, and innovation leadership in

education. CMU is consistently one of the top-ranked universities in the United States according

to U.S. News and World Report's Best Colleges rankings. It has more than 16,000 students,

115,000 alumni, and 1,500 faculty across the globe. CMU boasts the No. 1 School of Computer Science, 13 Turing Awards, and 20 Nobel Laureates.

3.     As a global research university, CMU is deeply committed to fostering and supporting useful research. To maximize the public benefit that its research generates, CMU often patents and commercializes inventions generated by its researchers. It then reinvests a portion of revenue generated from its inventions back into its education and research programs.

4.     Over the past 20 years, the United States Patent and Trademark Office ("USPTO") has awarded over 600 patents to CMU, thereby recognizing the innovative technologies generated by CMU researchers. And CMU was also recently recognized by the National Science Foundation for its robust ecosystem for translational research as demonstrated by its selection as a mentor institution for the National Science Foundation's Accelerating Research Translation Program.

5.     CMU is proud to call Pittsburgh, Pennsylvania home. CMU is a Pennsylvania not-for-profit corporation with its principal place of business at 5000 Forbes Avenue, Pittsburgh, PA 15213.

6.     Uber is a Delaware corporation with a principal place of business at 1725 Third Street, San Francisco, CA 94158.

7.     Uber has designated the Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, DE, 19801 as its agent for service of process.

8.     Uber Freight Holding Corporation ("Freight Holding") is a Delaware corporation with a principal place of business at 433 West Van Buren, Chicago, IL 60607.

9.     Freight Holding has designated the Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, DE, 19801 as its agent for service of process.

2

10.     Tupelo Parent, Inc. ("Tupelo") is a Delaware corporation with a principal place of business at 433 West Van Buren, Chicago, IL 60607.

11.     Tupelo has designated the Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, DE, 19801 as its agent for service of process.

12.     Uber Freight LLC ("Freight LLC") is a Delaware limited liability company with a principal place of business at 433 West Van Buren, Chicago, IL 60607.

13.     Freight LLC has designated the Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, DE, 19801 as its agent for service of process.

14.     Uber Freight US LLC ("Freight US") is a Delaware limited liability company with a principal place of business at 3010 Gaylord Pkwy #200, Frisco, Texas 75034.

15.     Freight US has designated the Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, DE, 19801 as its agent for service of process.

16.     For purposes of this Complaint, Freight Holding, Tupelo, Freight LLC, and Freight US are collectively referred to as the Uber Freight Companies.

## JURISDICTION AND VENUE

17.     This action includes claims of patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

18.     Subject matter jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1338(a).

19.     This Court has general personal jurisdiction over Defendants because their affiliation with the State of Delaware is so systematic and continuous to render them at home in Delaware. In particular, Defendants are Delaware corporations and have designated an agent for service of process in Delaware.

3

20.     This Court also has specific personal jurisdiction over Defendants because they have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Defendants have conducted business in this District by marketing, selling, offering for sale, and operating their products and services. Defendants also have committed and continue to commit acts of patent infringement within the State of Delaware.

21.     Venue in this District is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b). Defendants are Delaware corporations and therefore reside in this District. Defendants have transacted business in this District and have committed acts of infringement in this District.

## **BACKGROUND OF THE PATENTED TECHNOLOGY**

22.     Traditionally, online maps and other location-based services have been useful to help people locate points of interest and navigate from one point to another. The organizational units reflected in these traditional maps and services, such as neighborhoods, are often static and solely based on geographic location. As such, these maps failed to account for the changing dynamics of a city and often portrayed old realities.

23.     Likewise, traditional attempts to study the social dynamics of cities outside conventional organizational units were also extremely difficult and incomplete. The lack of accessible and available data made conducting such research an intensive process that could only ever provide a partial representation of different areas of a city.

24.     Faced with these challenges, researchers from CMU's School of Computer Science Justin Cranshaw, Raz Schwartz, Jason Hong, and Norman Sadeh (the "Inventors") developed systems and methods for determining and monitoring what they termed "Livehoods"—evolving, data-driven neighborhood clusters that reflect the every-day experiences of real people.

4



Figure 1: The municipal borders (black) and Livehoods for Shadyside/East Liberty (Left) and Lawrenceville/Polish Hill (Right).

25.    Contrary to traditional organizational units such as neighborhoods, Livehoods account for both the spatial proximity between venues as given by their geographic coordinates, as well as their social similarity. The resulting geographic clusters reflect current activity patterns of people in the city, thus revealing the dynamic nature of local urban areas, exposing their individual characters, and highlighting various forces that form the urban habitat.

26.    In 2012, the Inventors published a paper titled "The Livehoods Project: Utilizing Social Media to Understand the Dynamics of a City" (the "Livehoods Paper") and presented their research at the International Association for the Advancement of Artificial Intelligence Conference on Weblogs and Social Media ("ICWSM") in Dublin, Ireland. *See* Exhibit 1.

27.    The Inventors' work was immediately recognized as groundbreaking. Out of numerous works submitted and accepted by ICWSM, the Livehoods Paper received the Best Paper Award. *See* Exhibit 2.

5

28. Shortly after publication, the Inventors received dozens of inquiries regarding the Livehoods project.

29. Among them was one of Uber's own employees.

30. On April 17, 2012, Matt Sweeney, an engineer who worked on dynamic pricing at Uber, reached out to the Inventors to express excitement about the Livehoods project and interest in collaborating. *See* Exhibit 3.

31. The global recognition of the Inventors' work did not wane after publication. Indeed, throughout the years, the Inventors' work has been cited hundreds of times by those in academia and industry—including researchers from Microsoft, Yahoo, Nokia Bell Labs, MIT, Trinity College Dublin, Google, the University of Cambridge, AT&T, and IBM—and has been featured in several publications, including Bloomberg, the Wall Street Journal, and the MIT Tech Review. And ten years after its original publication, ICWSM honored the Livehoods Paper with the 2022 Test of Time Award, recognizing the sustained influence of the Inventors' work and their significant contributions to the field. *See* Exhibit 4.

32. To date, the work of the Inventors is protected by four United States patents: U.S. Patent No. 9,846,887; U.S. Patent No. 10,713,672; U.S. Patent No. 11,222,349; and U.S. Patent No. 11,935,082.

## THE PATENTS-IN-SUIT

33. CMU owns all rights, title, and interest in and has standing to sue for infringement of U.S. Patent No. 9,846,887 ("the '887 Patent"); U.S. Patent No. 10,713,672 ("the '672 Patent"); U.S. Patent No. 11,222,349 ("the '349 Patent"); and U.S. Patent No. 11,935,082 ("the '082 Patent") (collectively the "Patents-in-Suit"), including the right to sue and recover for all past, current, and future infringement. These patents are attached as Exhibits 5–8.

**A.      The '887 Patent**

34.      United States Patent No. 9,846,887 is entitled "Discovering Neighborhood Clusters and Uses Therefor" and issued on December 19, 2017.

35.      The named inventors on the '887 Patent are Justin Cranshaw, Raz Schwartz, Jason I. Hong, and Norman Sadeh-Koniecpol.

36.      The '887 Patent issued from U.S. Patent App. No. 14/015,506 filed on August 30, 2013. The '887 Patent claims the benefit of priority to Provisional Application No. 61/743,263 filed on August 30, 2012.

37.      The '887 Patent is assigned to CMU.

38.      The '887 Patent is valid and enforceable and directed to patentable subject matter.

39.      The claims of the '887 Patent offer numerous technological advantages over the traditional approach. By using venue check-in data and social similarity, neighborhood clusters are able to "reflect current collective activity patterns of people in a city, thus revealing the dynamic nature of local urban areas, exposing their individual characters, and highlighting various forces that form the urban habitat." Provisional Application No. 61/743,263 at 5.

40.      Likewise, traditional neighborhood clusters were often determined based on personal, subjective perceptions of a city. However, using venue check-in data and social similarity provides a dynamic and objective way to determine a neighborhood cluster.

41.       While each of the Patents-in-Suit address similar problems, they do so with different specific claimed methods. For example, claims of the '887 Patent describe a computer-implemented method for determining neighborhood clusters using "a check-in intensity vector for each of the multiple venues based on the venue check-in data" with values that are "based on at least a measure of intensity of check-ins of the corresponding one or more venue visitors to the

venue over a predetermined period of time;" generating "elements of a pairwise similarity matrix for the multiple venues" with a "similarity score" that is "indicative of a similarity between a different pair of the multiple venues . . . based on at least a measure of the similarity between the check-in intensity vectors for each of the pair of venues;" and determining "two or more geographic clusters of venues in the geographic region . . . based on at least the generated elements of the pairwise venue similarity matrix." *See, e.g.*, '887 Patent, Claim 23. Dependent claims provide additional specificity to the claimed technical solutions; for example, claim 24 further describes that the social similarity score can be determined based on both a geographic distance and social distance, and claims 28–31 provide that the check-in data from the venue visitors comprises check-in time data. *See, e.g.*, *id.* at Claims 24, 28–31.

42.     Furthermore, while the inventions of the '887 Patent represent improvements over the prior art, the elements of each claim, considered alone and as an ordered combination, were also not conventional, routine, or well-understood at the time of the invention. In fact, as described above, the advances represented by the '887 Patent were praised by the industry when they were introduced.

**B.     The '672 Patent**

43.     United States Patent No. 10,713,672 is entitled "Discovering Neighborhood Clusters and Uses Therefor" and issued on July 14, 2020.

44.     The named inventors on the '672 Patent are Justin Cranshaw, Raz Schwartz, Jason I. Hong, and Norman Sadeh-Koniecpol.

45.     The '672 Patent issued from U.S. Patent App. No. 15/845,203 filed on December 18, 2017. The '672 Patent is a divisional of the application that led to the '887 Patent and claims the benefit of priority to Provisional Application No. 61/743,263 filed on August 30, 2012.

46.     The '672 Patent is assigned to CMU.

47.     The '672 Patent is valid and enforceable and directed to patentable subject matter.

48.     The claims of the '672 Patent offer numerous technological advantages over the traditional approach. By using venue check-in data and social similarity, neighborhood clusters are able to "reflect current collective activity patterns of people in a city, thus revealing the dynamic nature of local urban areas, exposing their individual characters, and highlighting various forces that form the urban habitat." Provisional Application No. 61/743,263 at 5.

49.     Likewise, traditional neighborhood clusters were often determined based on personal, subjective perceptions of a city. However, using venue check-in data and social similarity provides a dynamic and objective way to determine a neighborhood cluster.

50.      While each of the Patents-in-Suit address similar problems, they do so with different specific claimed methods. For example, claims of the '672 Patent recite a computer-implemented method for determining a neighborhood cluster using "derived venue check-in data based on time-stamped location data captured by a plurality of electronic location sensors;" and "a host computer system" to identify "two or more geographic clusters of venues . . . using statistical inference from a probability distribution based on patterns of check-in time in the venue check-in data, such that the mix of venues for each cluster is emblematic of one of a predetermined number of temporal check-in pattern types." *See, e.g.*, '672 Patent, Claim 21. Other claims provide other, or additional, specificity to the claimed technical solutions; for example, claim 16 specifies that the plurality of electronic location sensors comprise mobile computing devices that each executes venue check-in software. *See, e.g.*, *id.* at Claim 16.

51.     Furthermore, while the inventions of the '672 Patent represent improvements over the prior art, the elements of each claim, considered alone and as an ordered combination, were

also not conventional, routine, or well-understood at the time of the invention. In fact, as described above, the advances represented by the '672 Patent were praised by the industry when they were introduced.

### C.      The '349 Patent

52.      United States Patent No. 11,222,349 is entitled "Discovering Neighborhood Clusters and Uses Therefor" and issued on January 11, 2022.

53.      The named inventors on the '349 Patent are Justin Cranshaw, Raz Schwartz, Jason I. Hong, and Norman Sadeh-Koniecpol.

54.      The '349 Patent issued from U.S. Patent App. No. 16/927,671 filed on July 13, 2020. The '349 Patent is a continuation of the application that led to the '672 Patent, which is a divisional of the application that led to the '887 Patent, and claims the benefit of priority to Provisional Application No. 61/743,263 filed on August 30, 2012.

55.      The '349 Patent is assigned to CMU.

56.      The '349 Patent is valid and enforceable and directed to patentable subject matter.

57.      The claims of the '349 Patent offer numerous technological advantages over the traditional approach. By using venue check-in data and social similarity, neighborhood clusters are able to "reflect current collective activity patterns of people in a city, thus revealing the dynamic nature of local urban areas, exposing their individual characters, and highlighting various forces that form the urban habitat." Provisional Application No. 61/743,263 at 5.

58.      Likewise, traditional neighborhood clusters were often determined based on personal, subjective perceptions of a city. However, using venue check-in data and social similarity provides a dynamic and objective way to determine a neighborhood cluster.

10

59.     While each of the Patents-in-Suit address similar problems, they do so with different specific claimed methods. For example, the claims of the '349 Patent recite a specific method of determining a neighborhood cluster using "venue check-in data" to calculate a "social similarity score between venues . . . wherein the social similarity score is based on a commonalities in the check-in data for each venue" and "identifying a neighborhood cluster . . . based on social similarity scores between pairs of venues." *See* '349 Patent, Claim 11.  Further independent claims describe other specific methods, including a specific method of determining neighborhood clusters using a "graph representation having nodes representing venues and edges weighted based on the affinity score between two nodes connected by each edge." *See, e.g.*, *id.* at Claim 1. Dependent claims provide additional specificity to the claimed technical solutions; for example, claim 13 recites that the neighborhood cluster is further determined using spectral clustering. *See, e.g.*, *id.* at Claim 13.

60.     Furthermore, while the inventions of the '349 Patent represent improvements over the prior art, the elements of each claim, considered alone and as ordered combinations, were also not conventional, routine, or well-understood at the time of the invention. In fact, as described above, the advances represented by the '349 Patent were praised by the industry when they were introduced.

**D.     The '082 Patent**

61.     United States Patent No. 11,935,082 is entitled "Discovering Neighborhood Clusters and Uses Therefor" and issued on March 19, 2024.

62.     The named inventors on the '082 Patent are Justin Cranshaw, Raz Schwartz, Jason I. Hong, and Norman Sadeh-Koniecpol.

63.     The '082 Patent issued from U.S. Patent App. No. 17/572,252 filed on January 10, 2022. The '082 Patent is a divisional of the application that led to the '349 Patent, which is a continuation of the application that led to the '672 Patent, which is a divisional of the application that led to the '887 Patent, and claims the benefit of priority to Provisional Application No. 61/743,263 filed on August 30, 2012.

64.     The '082 Patent is assigned to CMU.

65.     The '082 Patent is valid and enforceable and directed to patentable subject matter.

66.     The claims of the '082 Patent offer numerous technological advantages over the traditional approach. By using venue check-in data and social similarity, neighborhood clusters are able to "reflect current collective activity patterns of people in a city, thus revealing the dynamic nature of local urban areas, exposing their individual characters, and highlighting various forces that form the urban habitat." Provisional Application No. 61/743,263 at 5.

67.     Likewise, traditional neighborhood clusters were often determined based on personal, subjective perceptions of a city. However, using venue check-in data and social similarity provides a dynamic and objective way to determine a neighborhood cluster.

68.      While each of the Patents-in-Suit address similar problems, they do so with different specific claimed methods. For example, the claims of the '082 Patent recite a method for determining a neighborhood cluster using "venue check-in data;" "calculating a spatial proximity between pairs of the venues;" "calculating a social similarity score between pairs of venues;" and "calculating an affinity score between the venues in the pairs of venues, the affinity score based on the social similarity score . . . and the spatial proximity." *See* '082 Patent, Claim 1. Dependent claims provide additional specificity to the claimed technical solutions; for example, claim 2 describes "creating an affinity matrix containing an affinity score between the venues in each pair

of venues." *See, e.g., id* at Claim 2. As another example, claim 12 provides specific parameters used in calculating a social similarity score including "a check-in intensity vector representing the frequency of check-ins from individual venue visitors." *See, e.g., id.* at Claim 12.

69.     Furthermore, while the inventions of the '082 Patent represent improvements over the prior art, the elements of each claim, considered alone and as an ordered combination, were also not conventional, routine, or well-understood at the time of the invention. In fact, as described above, the advances represented by the '082 Patent were praised by the industry when they were introduced.

### FACTUAL BACKGROUND

70.     Plaintiff presents its claims and allegations herein in conjunction or in the alternative. To the extent that certain claims or allegations may be inconsistent with one another, such allegations should be understood to be made in the alternative.

### A.    Uber's Platform

71.     In general, Uber operates its business as three operating and reportable segments: Mobility, Delivery, and Freight.

72.     Uber develops and operates technology applications in support of each segment, and each technology application supports a variety of products and services ("offerings"). Together, these applications and offerings constitute Uber's Platform (the "Platform").

73.     Uber's Mobility offerings connect consumers with a wide range of transportation modalities, such as ridesharing, carsharing, micromobility, rentals, public transit, taxis, and more. The technology applications or services supporting Uber's Mobility offerings include at least Uber ridesharing (the Uber app), Uber Driver, Uber Fleet, Uber Transit, Uber Health, and Uber for Business.

74. Uber owns and operates the Uber app[1] that matches consumers looking for rides ("riders") and independent providers of ride services ("providers"). In addition to matching riders and providers, the Uber app can also match riders with other forms of transportation, including public transit, bikes, and scooters.

75. Uber's Delivery offerings allow consumers to search for and discover local commerce including restaurants, grocery, alcohol, convenience, and other retailers to order a meal or other items and have it delivered. The technology applications or services supporting Uber's Delivery offering include at least Uber Eats and Uber Direct.

76. The Uber Eats application can be used to connect consumers and restaurants, grocers, and other merchants so they can buy and sell meals, groceries, and other items, and Uber then matches them with delivery service providers. Uber Direct is Uber's white-label Delivery-as-a-Service offering to retailers and restaurants.

77. In 2020, Uber introduced its "Super App" view on iOS and Android, which combines its multiple offerings into a single app.

78. Uber's Freight offerings provide a managed transportation and logistics network that connects shippers and carriers on the Uber Platform. The technology applications or services supporting Uber's Freight offerings include at least the Uber Freight app and the Uber Freight website.

79. Uber owns the Uber Freight app and the Uber Freight website.

---

[1] For purposes of this Complaint, Plaintiff will refer generally to the Uber app as an exemplar for Defendants' infringing systems and activities, but Plaintiff's allegations are not limited to a single application and apply equally to Defendants' infringing activity through the use or operation of any offering on Uber's Platform.

**B.      Uber's Vicarious Liability**

80.      Freight Holding is a majority-owned subsidiary of Uber.

81.      Uber owns approximately 84% of the capital stock of Freight Holding, or 80% on a fully diluted basis.

82.      Freight Holding is a holding company that was created to hold equity in the operating business comprising the Uber Freight line of business.

83.      Uber is the primary beneficiary of Freight Holding because it has the power to direct the activities that most significantly impact the economic performance of Freight Holding.

84.      Tupelo is a wholly owned subsidiary of Freight Holding.

85.      Freight US is a wholly owned subsidiary of Tupelo.

86.      Freight LLC and Freight US are affiliate companies and share at least one common direct or indirect owner.

87.      Freight LLC and Freight US are both 100% directly or indirectly owned subsidiaries of Freight Holding.

88.      The purpose of the Uber Freight Companies is to perform the business activities of the Freight operating segment of Uber.

89.      Uber uses the same network and technology used for Mobility and Delivery to connect shippers with carriers in the freight industry for its Freight offerings.

90.      Uber manifests assent for the Uber Freight Companies to act on its behalf, and the Uber Freight Companies do so act.

91.      Uber holds the Uber Freight offering out to the public as its own product and service. Uber connects shippers and carriers in the freight industry via the Uber Freight app.

92.      The Uber Freight Companies are agents of Uber.

15

93. Uber directs and controls the actions of the Uber Freight Companies, including those related to infringement of the Patents-in-Suit.

94. Uber conditions the Uber Freight Companies' receipt of certain benefits on the performance of activities, including those related to infringement of the Patents-in-Suit.

95. Uber specifies the timing and manner of performance of activities by the Uber Freight Companies, including those related to infringement of the Patents-in-Suit.

96. Uber profits from the activities of the Uber Freight Companies, including those related to infringement of the Patents-in-Suit.

97. Uber has the right to cause the Uber Freight Companies to stop or limit their infringing activities.

98. Uber has declined to exercise its right to cause the Uber Freight Companies to stop or limit their infringing activities, choosing instead to profit from those infringing activities.

99. Uber is vicariously liable for the infringing activities of its partially and wholly owned subsidiaries, including the Uber Freight Companies, used to operate or facilitate its Mobility, Delivery and Freight offerings.

100. Tupelo and Freight US are agents of Freight Holding.

101. Freight Holding directs and controls the actions of Tupelo and Freight US, including those related to infringement of the Patents-in-Suit.

102. Freight Holding conditions Tupelo's and Freight US's receipt of certain benefits on the performance of activities, including those related to infringement of the Patents-in-Suit.

103. Freight Holding specifies the timing and manner of performance of activities by Tupelo and Freight US, including those related to infringement of the Patents-in-Suit.

104. Freight Holding profits from the activities of Tupelo and Freight US, including those related to infringement of the Patents-in-Suit.

105. Freight Holding has the right to cause Tupelo and Freight US to stop or limit their infringing activities.

106. Freight Holding has declined to exercise its right to cause Tupelo and Freight US to stop or limit their infringing activities, choosing instead to profit from those infringing activities.

107. Freight Holding is vicariously liable for the infringing activities of Tupelo and Freight US used to operate or facilitate Uber's Freight offerings.

108. Freight US is an agent of Tupelo.

109. Tupelo directs and controls the actions of Freight US, including those related to infringement of the Patents-in-Suit.

110. Tupelo conditions Freight US' receipt of certain benefits on the performance of activities, including those related to infringement of the Patents-in-Suit.

111. Tupelo specifies the timing and manner of performance of activities by Freight US, including those related to infringement of the Patents-in-Suit.

112. Tupelo profits from the activities of Freight US, including those related to infringement of the Patents-in-Suit.

113. Tupelo has the right to cause Freight US to stop or limit its infringing activities.

114. Tupelo has declined to exercise its right to cause Freight US to stop or limit its infringing activities, choosing instead to profit from those infringing activities.

115. Tupelo is vicariously liable for the infringing activities of Freight US used to operate or facilitate Uber's Freight offerings.

116. Freight LLC is an agent of Freight Holding and/or Tupelo.

17

117.    Freight Holding and/or Tupelo direct and control the actions of Freight LLC, including those related to infringement of the Patents-in-Suit.

118.    Freight Holding and/or Tupelo condition Freight LLC's receipt of certain benefits on the performance of activities, including those related to infringement of the Patents-in-Suit.

119.    Freight Holding and/or Tupelo specify the timing and manner of performance of activities by Freight LLC, including those related to infringement of the Patents-in-Suit.

120.    Freight Holding and/or Tupelo profit from the activities of Freight LLC, including those related to infringement of the Patents-in-Suit.

121.    Freight Holding and/or Tupelo have the right to cause Freight LLC to stop or limit its infringing activities.

122.    Freight Holding and/or Tupelo have declined to exercise their right to cause Freight LLC to stop or limit its infringing activities, choosing instead to profit from those infringing activities.

123.    Freight Holding and/or Tupelo are vicariously liable for the infringing activities of Freight LLC used to operate or facilitate Uber's Freight offerings.

124.    Uber, Freight US, and Freight LLC direct and control the actions of their respective employees, independent contractors, and agents, including those related to infringement of the Patents-in-Suit.

125.    Uber, Freight US, and Freight LLC condition their respective employees', independent contractors', and agents' receipt of certain benefits on the performance of activities, including those related to infringement of the Patents-in-Suit.

126.    Uber, Freight US, and Freight LLC specify the timing and manner of performance of activities by their respective employees, independent contractors, and agents, including those related to infringement of the Patents-in-Suit.

127.    Uber, Freight US, and Freight LLC profit from the activities of their respective employees, independent contractors, and agents, including those related to infringement of the Patents-in-Suit.

128.    Uber, Freight US, and Freight LLC each have the right to cause their respective employees, independent contractors, and agents to stop or limit their infringing activities.

129.    Uber, Freight US, and Freight LLC have each declined to exercise their right to cause their respective employees, independent contractors, and agents to stop or limit their infringing activities, choosing instead to profit from those infringing activities.

130.    Uber, Freight US, and Freight LLC are vicariously liable for the infringing activities of their respective employees, independent contractors, and agents used to operate or facilitate Uber's Mobility, Delivery and Freight offerings.

131.    Uber's partners, suppliers, vendors, and/or partially or wholly owned subsidiaries that host, run, or operate software or network applications or services and those that collect, share, process, or store data for Uber ("other Uber partners") are agents of Uber.

132.    Uber directs and controls the actions of other Uber partners, including those related to infringement of the Patents-in-Suit.

133.    Uber conditions other Uber partners' receipt of certain benefits on the performance of activities, including those related to infringement of the Patents-in-Suit.

134.    Uber specifies the timing and manner of performance of activities by other Uber partners, including those related to infringement of the Patents-in-Suit.

135.    Uber profits from the activities of other Uber partners, including those related to infringement of the Patents-in-Suit.

136.    Uber has the right to cause other Uber partners to stop or limit their infringing activities.

137.    Uber has declined to exercise its right to cause other Uber partners to stop or limit their infringing activities, choosing instead to profit from those infringing activities.

138.    Uber is vicariously liable for the infringing activities of other Uber partners used to operate or facilitate its Mobility, Delivery and Freight offerings.

139.    The Uber Freight Companies' partners, suppliers, vendors, and/or partially or wholly owned subsidiaries that host, run, or operate software or network applications or services and those that collect, share, process, or store data for the Uber Freight Companies ("other Uber Freight partners") are agents of the Uber Freight Companies.

140.    The Uber Freight Companies direct and control the actions of other Uber Freight partners, including those related to infringement of the Patents-in-Suit.

141.    The Uber Freight Companies condition other Uber Freight partners' receipt of certain benefits on the performance of activities, including those related to infringement of the Patents-in-Suit.

142.    The Uber Freight Companies specify the timing and manner of performance of activities by other Uber Freight partners, including those related to infringement of the Patents-in-Suit.

143.    The Uber Freight Companies profit from the activities of other Uber Freight partners, including those related to infringement of the Patents-in-Suit.

20

144.    The Uber Freight Companies have the right to cause other Uber Freight partners to stop or limit their infringing activities.

145.    The Uber Freight Companies have declined to exercise their right to cause other Uber Freight partners to stop or limit their infringing activities, choosing instead to profit from those infringing activities.

146.    The Uber Freight Companies are vicariously liable for the infringing activities of other Uber Freight partners used to operate or facilitate Uber's Freight offerings.

C.    **Uber's Infringing Hexclustering System**

147.    One of Uber's main goals is to not run out of cars available to provide services in a given area.[2]

148.    Uber introduced surge pricing in 2012 to ensure that it does not run out of cars when there is a sudden increase in demand in a given area.[3]

149.    Initially, surge pricing worked on a city scale, but it did not entirely solve the problem caused by a sudden increase in demand in a local area.[4]

---

[2] *See* https://www.youtube.com/watch?v=ay2uwtRO3QE at 1:12–56 ("In the beginning, our mission in dynamic pricing was to not run out of cars. This was a huge problem in the beginning during high demand events . . . if [supply] gets too low, then we've run out of cars, and [] that is against our mission. Our goal is to be as reliable as running water, and if there are no cars to dispatch, we've failed.").

[3] *See id.* at 2:00–54 ("We introduced surge pricing. This was first introduced and did very well during New Years Eve when we have city scale demand. Everyone is out partying, everyone needs rides, and so surge demand kicks in. It incentivizes drivers to come out on the road, open and make themselves available for dispatching so that we can meet this spike in demand. And that worked, but it wasn't solving the problem entirely. It solved the problem at a city scale, and so what we really needed after that was to not run out of cars in neighborhoods with a high highly localized demand[.]").

[4] *Id.*

21

150.    In 2012, Uber needed a system or method to ensure that it did not run out of cars in neighborhoods with a highly localized demand.[5]

151.    To try and solve this problem, Uber introduced neighborhood surge, or geofence surge, around 2014.[6]

152.    Uber's neighborhood surge feature involved defining geofences by shapes on a map in order to surge specific areas in a city.[7]

153.    However, neighborhood surge did not solve the entire problem because it only provided an incomplete and imperfect representation of the supply and demand in a given area.[8]

154.    For example, neighborhood surge created a surge cliff where there was high surge pricing in one area, and an invisible line, and on the other side low surge pricing.[9]

155.    A surge cliff has a negative effect on the marketplace called a boundary effect.[10]

---

[5] *Id.*

[6] *See id.* at 2:44–3:47 (". . .and so what we really needed after that was to not run out of cars in neighborhoods with a high highly localized demand, like sports events or concerts or anything that is specific to locations or areas or even something as simple as rush-hour where there's downtown and outskirts and suburbs. We needed to be able to handle those demand spikes to make sure that we don't run out of cars in those areas. So, we introduced neighborhood surge or geofence surge. We drew these shapes, call them geofences, in the general area of neighborhoods . . . so we can surge specific areas in a city . . . and that's what I'm showing here. This is a driver app in 2014.").

[7] *See id.*

[8] *See, e.g., id.* at 4:53–9:38 (discussing surge cliffs, phantom surge, and scalability problems with neighborhood surge).

[9] *See id.* at 6:43–7:03 ("That's a bad experience for the rider, and that's not something that we want and so what really is happening here is there's a surge cliff. We have high surge in one area and an invisible line and on the other side, low surge.").

[10] *See id.* at 7:03–34 ("This surge cliff creates a negative effect on the marketplace, call it a boundary effect. This boundary effect is causing, is causing excessive cancellations in these areas, and so we, you know, we thought dang, we thought it was such a good solution, but we need something else. We don't like this, this is a bad experience, but it's not just bad for the riders, it's also bad for the drivers.").

22

156.    A surge cliff causes excessive ride cancellations.[11]

157.    Neighborhood surge also did not account for unevenly distributed demand throughout a neighborhood and led to phantom demand.[12]

158.    Neighborhood surge had scalability issues.[13]

159.    In 2014, Uber really needed to solve the problems caused by neighborhood surge.[14]

160.    In part to solve the problems caused by neighborhood surge, Uber implemented what it calls the H3 hexagon and hexclustering system.[15]

---

[11] *See id.*

[12] *See id.* at 7:43–8:40 ("We think there is different demand in this neighborhood, but the flaw here is we think it's well distributed because we've drawn this shape around the entire downtown area. In reality, Dreamforce just got out, everyone's at the Moscone Center. The driver does not know that and just hangs out waiting. Where is this demand? I was shown demand. I want that surge. There's no demand. That's a bad experience. We call that phantom demand. There is demand, but it's not right where they think it is or where we've shown it. That's problematic. We're unintentionally misleading expectations . . . that's bad, we don't like that. So, this is a problem, and we're like ok, we really need to solve this problem.").

[13] *See id.* at 9:28–42 ("But, we got it, right, we got the picture, we need to change something. What do we do? We have boundary effect, we have phantom demand, and scalability issues. Ok, this is a big problem.").

[14] *See id.* at 8:36–40 ("So this is a problem, and we're like ok, we really need to solve this problem.").

[15] *See id.* at 9:42–11:50 ("Neighborhoods made sense at a big picture—they are centers of area that exhibit similar patterns, but in reality, riders and drivers are on the ground. They are at a much smaller scale than cities, and we need to model our supply and demand indexing systems to match that. We need to understand what's happening at a small scale, we need to be able to understand all of that small scale action at a large scale, at city scale, we need to do it at a global scale. We need to do it all around the world, for hundreds and hundreds of cities, and we don't want to do it all the time. Ok, so I think hexagons would be a good idea. . .we can implement smooth gradients of demand. We can show drivers clearly where the centers of demand are, and my favorite is we don't have to draw the neighborhoods. We don't have to spend the time to understand the city, or you know, make sure that we're encompassing the right amount of, or our interpretation of what demand should look like, we can let the city tell us where is your demand, where is the, where do we need to send cars, where are the need for supply. And we can do this globally, we can do this fast.").

161.    Before using H3 hexclusters, surge pricing could not solve the problem of ensuring Uber did not run out of cars to meet localized changes in supply and demand.[16]

162.    H3 is a grid system used throughout Uber to support quantitative analysis of the Uber marketplace.[17]



*Uber's H3 hexagon grid of the world.*

163.    Uber uses H3 to analyze geographic information to set dynamic prices and make other decisions on a city-wide level.[18]

164.    Zones like postal codes or traditional neighborhood lines are not ideal for large scale analysis at least because they are subjective, require frequent updating, and subject to arbitrary changes.[19]

---

[16] *See, e.g.*, *id.* at 4:53–8:40.

[17] *See* https://www.uber.com/blog/h3/ ("We use H3 as the grid system for analysis and optimization throughout our marketplaces.").

[18] *See id.* ("H3 enables us to analyze geographic information to set dynamic prices and make other decisions on a city-wide level.").

[19] *See id.* ("There are other choices we could use for bucketing events into areas, for instance polygonal zones around areas. These could be postal code areas, but such areas have unusual shapes and sizes which are not helpful for analysis, and are subject to change for reasons entirely unrelated to what we would use them for. Zones could also be drawn by Uber Operations teams based on their knowledge of the city, but such zones require frequent updating as cities change and often define the edges of areas arbitrarily. Grid systems can have comparable shapes and sizes across the cities that Uber operates in and are not subject to arbitrary changes.").



Figure 3. Zip code map of New York City (Manhattan).

165.    Uber chose not to use zones drawn by Uber Operations based on their knowledge of the city at least because such zones require frequent updating as cities change and often define the edges of areas arbitrarily.[20]

166.    While a hexagonal grid system does not align to streets and neighborhoods in cities, it can be used to efficiently represent neighborhoods by clustering grid cells.[21]



Figure 4. Randomly generated hexagonal clusters cover the city of San Francisco.

---

[20] *See id.*

[21] *See id.* ("While grid systems do not align to streets and neighborhoods in cities, they can be used to efficiently represent neighborhoods by clustering grid cells.").

167.    Clustering hexagons can be done using objective functions, producing shapes much more useful for analysis.[22]

168.    Uber refers to a user requesting a ride or food or a driver-partner accepting a request for a ride or food as "events."[23]

169.    Millions of events occur in the Uber marketplace every day.[24]

170.    Each event happens at a specific location.[25]

171.    Uber uses the H3 grid system to bucket event data into hexagonal areas or cells.[26]

172.    Riders and providers generate location data when they request or accept a ride in the Uber application.[27]

173.    Riders can indicate location data manually, by inputting their location into the Uber application, or automatically, by sharing their live location data with Uber.[28]

---

[22] *See id.* ("Clustering can be done using objective functions, producing shapes much more useful for analysis.").

[23] *See id.* ("Every day, millions of events occur in the Uber marketplace. Every minute, riders request rides, driver-partners start trips, and hungry users request food, among other actions on the platform. Each event happens at a specific location, for example, a rider requests a ride from home, and a driver accepts that request in their car just a few miles away.").

[24] *See id.*

[25] *See id.*

[26] *See id.* ("We use a grid system to bucket events into hexagonal areas, in other words, cells. Data points are bucketed into hexagons and can be written using the hexagonally bucketed data. For example, we calculate surge pricing by measuring supply and demand in hexagons in each city that we serve. These hexagons form the basis for our analysis of the Uber marketplace.").

[27]    *See, e.g.,*    https://help.uber.com/riders/article/sharing-your-pickup-location-ios-?nodeId=4081f2b2-18f3-4724-8696-4a1a8860eb58 ("Live location sharing is turned on, by default, for riders and drivers during the last three minutes of the pickup."); https://help.uber.com/riders/article/sharing-your-pickup-location-android?nodeId=c9b17922-551f-4ba3-9abe-26b582ef927a (same).

[28]    *See*    https://help.uber.com/riders/article/how-uber-uses-rider-location-information?nodeId=741744cb-125c-4efc-ab3f-4a977940ac87 ("You'll see a request prompted by your device for permission to share your location information when you sign up for Uber, which includes lo-

26

174.    When live location sharing is enabled, Uber will collect the live pickup location of a rider and provider by default.[29]

175.    Uber's webpage related to use of the Uber app contains instructions on how users can share their location.[30]



_____

cation data collected via Bluetooth and nearby wifi signals."); https://help.uber.com/en/riders/article/privacy-protection-for-riders?nodeId=74ecf382-9922-40d9-b4f6-6e5b6f30bea4 ("You don't need to turn on your device's location services to use the Uber app. However, certain features, like sharing your trip with trusted contacts, require location information to work. If you don't use location services, you can still use Uber by manually entering your pickup and dropoff locations in the app. You can also use cross streets or landmarks instead of an address. You can choose whether to use location services in the privacy settings of your Uber app.").

[29]    *See*    https://help.uber.com/en/riders/article/privacy-protection-for-riders?nodeId=74ecf382-9922-40d9-b4f6-6e5b6f30bea4 ("When live location sharing is enabled, your location will be shared with your driver . . . [t]his feature is turned on by default[.]"); https://help.uber.com/riders/article/sharing-your-pickup-location-ios-?nodeId=4081f2b2-18f3-4724-8696-4a1a8860eb58 ("Live location sharing is turned on, by default, for riders and drivers during the last three minutes of the pickup."); https://help.uber.com/riders/article/sharing-your-pickup-location-android?nodeId=c9b17922-551f-4ba3-9abe-26b582ef927a (same).

[30] *See, e.g.*, https://help.uber.com/en/riders/article/sharing-your-location?nodeId=469ed54f-3c45-4efc-8aa3-aafdf316a6b2.

176.    Providers can indicate location data manually, by inputting their location into the Uber application, or automatically, by sharing their live location data with Uber.[31]

177.    Uber stores rider and provider trip data including the times and locations at which a trip started and ended.[32]

> **Rider** folder contains the following files:
>
> 1. Rider App Analytics - 30 days of mobile event data, such as device OS, device model, device language, app version, and the time and location the data was collected
> 2. Trips Data Summary - Times and locations at which a trip was requested, started, and ended, as well as distance traveled

> **Driver / Delivery Partner** folder containing the following files:
>
> 1. Driver App Analytics - 30 days of mobile event data, such as device OS, device model, device language, app version, and the time and location the data was collected
> 2. Driver Lifetime Trips - Times at which each trip started and ended, as well as distance traveled and fare information
> 3. Driver Payments - Payments received for each trip, categorized by type of fare and fee
> 4. Driver Documents - Driver documents you've uploaded to Uber, such as driver's license, insurance, and vehicle registration.

178.    Rider and provider location data indicate in which H3 hexagon an event occurs.[33]

---

[31] *See* https://www.uber.com/us/en/drive/driver-app/#taking-trips; https://help.uber.com/riders/article/sharing-your-pickup-location-ios-?nodeId=4081f2b2-18f3-4724-8696-4a1a8860eb58 ("Live location sharing is turned on, by default, for riders and drivers during the last three minutes of the pickup.");  https://help.uber.com/riders/article/sharing-your-pickup-location-android?nodeId=c9b 17922-551f-4ba3-9abe-26b582ef927a (same).

[32] *See* https://help.uber.com/riders/article/whats-in-your-data-download?nodeId=3d476006-87a4-4404-ac1e-216825414e05.

[33] *See* https://www.uber.com/blog/h3/ ("We use a grid system to bucket events into hexagonal areas, in other words, cells. Data points are bucketed into hexagons and can be written using the hexagonally bucketed data. For example, we calculate surge pricing by measuring supply and demand in hexagons in each city that we serve. These hexagons form the basis for our analysis of the Uber marketplace.").



Figure 2. The maps above depict the process of bucketing points with H3: cars in a city; cars in hexagons; and hexagons shaded by number of cars.

179.    Carriers using the Uber Freight application generate location data when a load is in progress.[34]

# What is Uber Freight's Data Policy?

## Why does Uber Freight collect GPS data?

Uber Freight uses the GPS location data to improve efficiency by:

- Reducing or eliminating calls to dispatchers and/or drivers on loads in progress
- Tracking loads booked via the Uber Freight platform

In the future, this data may be used for automatic processing of detention and other carrier accessorials.

180.    Uber Freight has an automated tracking policy, and a carrier may be at risk for deactivation due to non-compliance if they choose not to share automatic tracking data.[35]

## What happens if I choose not to share automatic tracking data?

The dispatcher and/or driver will receive an average of 5 tracking calls per load. A carrier may also be at risk for deactivation due to being non-compliant with Uber Freight's automated tracking policy.

---

[34]    *See*   https://help.uber.com/freight/carrier/article/what-is-uber-freight%E2%80%99s-data-pol-icy?nodeId=b4a2c49a-6e2c-4f41-983e-0349d9e301ef.

[35] *See id.*

181.    Carriers and carrier drivers cannot use the Uber Freight app if they do not permit location data collection.[36]

182.    The Uber Freight Companies use Carrier location data to conduct analysis, testing, and research.[37]

183.    Uber uses rider and provider location data to conduct analysis, research, and product development.[38]

184.    The Uber Freight Companies store carrier location data in a database.[39]

**Does Uber Freight share my GPS data with anyone?**

Uber Freight may share location data with the shipper and/or receiver of a load to keep them informed of the location of their freight while in transit. In addition, Uber Freight may share this data with other third parties who require, request, or use such data in connection with transportation, logistics, delivery, and/or other related services arranged or performed by Uber Freight.

For more information, please see the Uber Freight Privacy Notice.

**How long does Uber Freight store my data?**

Uber Freight stores location data that can be tied to a specific carrier for 3 years. After 3 years, Uber Freight destroys the location data.

185.    Uber stores rider and provider event data, including location data, in a database.[40]

---

[36] *See* https://www.uberfreight.com/uber-freight-legal/privacy-policy/ ("Carriers and carrier drivers cannot use the Uber Freight app if they do not permit location data collection").

[37] *See* https://www.uberfreight.com/uber-freight-legal/privacy-policy/ ("Uber Freight uses the data we collect to provide, personalize, maintain, and improve our products and services. This includes using data to: . . . Perform internal operations necessary to provide our services, including to troubleshoot software bugs and operational problems; to conduct data analysis, testing, and research; and to monitor and analyze usage and activity trends.").

[38]    *See*    https://www.uber.com/legal/en/document/?name=privacy-notice&country=united-states&lang=en. ("We use data for analysis, research and product development, including training machine learning models.").

[39]    *See*   https://help.uber.com/freight/carrier/article/what-is-uber-freight%E2%80%99s-data-policy?nodeId=b4a2c49a-6e2c-4f41-983e-0349d9e301ef.

[40] *See* https://www.youtube.com/watch?v=aCj-YVZ0mlE at 3:50–4:28 (indicating use of a Cluster Generation Data Warehouse); https://www.uber.com/blog/gairos-scalability/.



186.    Uber clusters H3 hexagons or cells based on event data.[41]



187.    Uber calls clusters of H3 hexagons "hexclusters."[42]

---

[41] *See* https://www.youtube.com/watch?v=aCj-YVZ0mlE at 3:50–4:28 ("We use a lot of historical trip data and feed it as inputs to a hierarchical clustering algorithm that agglomerates all these hexagons [] into larger and larger clusters.") (indicating the use of Cluster Management and Cluster Generation components in the Uber Hexclustering system).

[42] *See* https://www.youtube.com/watch?v=aCj-YVZ0mlE at 0:43–48 ("So internally we refer to hexagon clusters as hexclusters").

31



188.   Hexclusters are used by many applications at Uber including, for example, deter-mining driver incentives on the Uber app and determining a restaurant delivery area for Uber Eats.[43]

189.   In particular, Uber uses hexclustering and clustering algorithms to forecast demand, determine driver incentives, and set pricing models (including surge pricing).[44]

---

[43] *See* https://www.youtube.com/watch?v=aCj-YVZ0mlE at 5:01–27 ("Each team at Uber has their own business use case for hexclusters. For example, the incentives team might want to use hexclusters [] to decide where to deploy incentives to get the maximum impact whereas the Uber Eats team might want to use hexclusters to define the area that a—that a restaurant can deliver orders in.").

[44] *See* https://www.youtube.com/watch?v=aCj-YVZ0mlE at 7:57–8:25 ("A lot of the use cases that we have at Uber revolve around forecasting demand in a given area and hexclusters are perfect for that as well as for deciding where to deploy driver incentives or in terms of pricing models we can predict where to increase the price or decrease the price, and of course, everyone's favorite thing about Uber, surge, is based on hexclusters too.").



190.    Uber calculates surge pricing by measuring supply and demand in hexagons.[45]

191.    The price of an Uber ride is based, at least in part, on a short-term prediction of supply and demand.[46]

192.    Uber determines the price of an Uber ride by reading demand and supply data in each hexagon.[47]

> ## Use Cases at Uber
>
> We use Gairos for a wide variety of insights-collecting use cases at Uber, including:
>
> - Dynamic pricing: Surge pricing service is reading demand and supply data based on hexagon to calculate surge multiplier at specific location and time.
> - Driver Movement uses real time demand and supply data to generate driver surge and carbon suggestions for drivers.
>
> We refer to the data underlying each trip as a session, which begins when a user opens the Uber app. That action triggers a string of data events, from when the driver actually accepts a ride to the point where the trip has been completed. Given the complexity and scale of our systems, this data is distributed over multiple disparate event streams.

---

[45] *See* https://www.uber.com/blog/h3/ ("For example, we calculate surge pricing by measuring supply and demand in hexagons in each city that we serve.").

[46] *See id.*; https://www.youtube.com/watch?v=GyPq2joHZv4 at 9:40–45 ("When we're determining the price we need to look at a short-term prediction of supply and demand").

[47] *See* https://www.uber.com/blog/gairos-scalability/.

193.    Uber uses real time demand and supply data to generate driver surge pricing.[48]



Figure 5: Surge multipliers for different hexagons in Oakland when there is a game.

194.    Using hexclusters, Uber does not have to spend the time to understand a city or make sure it is encompassing the right amount of, or its interpretation of what demand should look like. Uber can let the city tell it where demand and supply are.[49]

---

[48] *See id.* ("Driver Movement uses real time demand and supply data to generate driver surge and carbon suggestions for drivers. . . . To calculate the surge multiplier for a hexagon defined by H3, the number of requests (demand) and the number of available drivers (supply) will be queried from Gairos to get the latest data.").

[49] *See* https://www.youtube.com/watch?v=ay2uwtRO3QE at 11:07–39 (". . .we can implement smooth gradients of demand. We can show drivers clearly where the centers of demand are, and my favorite is, we don't have to draw the neighborhoods, we don't have to spend the time to understand the city or, you know, make sure that we're encompassing the right amount of, or our interpretation of what demand should look like—we can let the city tell us where is your demand, where is the, where do we need to send cars, where are the need for supply.").



195.    Clustering hexagons allows Uber to show drivers clearly where the centers of demand are in a city.[50]

196.    Uber tries to cluster hexagons that are similar.[51]



197.    Similarity of hexagons is determined at least in part by whether hexagons share common characteristics other than spatial proximity. Those characteristics include commonalities in rider behavior.[52]

---

[50] *Id.*

[51] *See* https://www.youtube.com/watch?v=kRqFn7jAsoo at 8:20–35 ("And in our case, what we are trying to do, is to find hexagons that are similar to each other, so that we can cluster them into one cluster.").

[52] *See, e.g., id.* at 11:30–12:10 ("What we're trying to do is—we want to find two hexagons that are always appearing with other, similar sets of hexagons. So, there are two cases. One is—with

198.    Uber utilizes hierarchical clustering when creating hexclusters.[53]



199.    Uber only clusters hexagons if they are neighboring to each other.[54]

200.    Uber calculates the pairwise distance between hexagons and their Ward linkage to determine whether a pair of hexagons should be clustered.[55]

201.    Likewise, Uber segments hexclusters to achieve the desired granularity.[56]

---

the same restaurant hexagon, a lot of trips actually goes to a destination hexagon A and a destination hexagon B, then we think A and B are similar. Or the other way around, there is a eater hexagon and then there are two restaurant hexagons that always deliver to that eater hexagon, then we think these two restaurant hexagons are similar to each other. So that's the basic idea of how similarity is defined.").

[53] *See id.* at 12:32–41 ("We can then apply clustering methodologies, right, so we're using a canonical hierarchical clustering").

[54] *See id.* at 13:01–14:02 ("We want to make sure that we can only cluster hexagons if they are neighboring to each other, right, so imagine a world that two hexagons are very close in terms of their distance of similarities but they're actually not in close proximity of geo-level, we are going to end up with disjoint components that form one hexcluster which is not desirable. So, one constraint that we reinforce is there should be connectivity. And then the second thing that is what distance should we use so we can compare the pairwise distance. And here we are using Ward linkage which minimizes the within cluster variance, so for each pair of connected hexagons, we can compute this Ward linkage, and then we merge, we cluster together the pair that, that gives us, gives us the smallest within cluster variance.").

[55] *See id.*

[56] *See id.* at 14:25–39 ("Ultimately we want a segmentation, we don't want like a big city ID . . . so we can cut at different levels for the desired granularity").

202.    Hexclusters are formed based on historical and real-time data.[57]

203.    Uber licenses all or part of its technology stack, including its hexclustering system, to Freight LLC and Freight US.

204.    Freight US and Freight LLC use Uber's hexclustering system to forecast demand, determine driver incentives, and set pricing models.

### ALLEGATIONS OF PATENT INFRINGEMENT

205.    Plaintiff incorporates the allegations of all the foregoing paragraphs as if fully restated herein.

206.    Defendants do not have CMU's permission to use any technology protected by the Patents-in-Suit.

207.    The "Accused Instrumentalities" that infringe one or more claims of the Patents-in-Suit include Defendants' H3 hexagon and hexclustering systems (including the systems used to support or enable Defendants' use and operation of the H3 hexagon and hexclustering systems) as well as Defendants' products and services that use the H3 hexagon and hexclustering systems to, for example, create dynamic neighborhoods used to forecast demand, determine driver incentives, determine driver and restaurant delivery areas, and set pricing models (including surge pricing).[58]

---

[57] *See, e.g.*, https://www.uber.com/blog/h3/ ("For example, we calculate surge pricing by measuring supply and demand in hexagons in each city that we serve."); https://www.youtube.com/watch?v=aCj-YVZ0mlE at 3:50–4:28 ("We use a lot of historical trip data and feed it as inputs to a hierarchical clustering algorithm that agglomerates all these hexagons [] into larger and larger clusters."); https://www.uber.com/blog/gairos-scalability/ ("Driver Movement uses real time demand and supply data to generate driver surge and carbon suggestions for drivers . . . To calculate the surge multiplier for a hexagon defined by H3, the number of requests (demand) and the number of available drivers (supply) will be queried from Gairos to get the latest data.").

[58] For purposes of this Complaint, Plaintiff will refer generally to the Uber app as an exemplar for Defendants' infringing systems and activities, but Plaintiff's allegations are not limited to a single application and apply equally to Defendants' infringing activity through the use of any offering on Uber's Platform.

Further discovery may reveal additional infringing applications, services, and/or functionalities.

208.    Plaintiff reserves the right to accuse any of Defendants' products or services in the disclosure of infringement contentions in this action and to accuse any infringing products revealed by further discovery in this case including forthcoming technology not yet in use or commercially available.

209.    As set forth below, the Accused Instrumentalities incorporate, without a license from CMU, technology protected by patents owned by CMU. CMU respectfully seeks relief from this Court for Defendants' infringement.

### COUNT I: INFRINGEMENT OF THE '887 PATENT

210.    Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

211.    Defendants have willfully infringed and continue to willfully infringe the '887 Patent.

212.    Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '887 Patent under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell the Accused Instrumentalities in this District and elsewhere in the United States.

213.    CMU provides the following explanation of infringement with regard to an exemplary claim compared to an exemplary functionality. CMU reserves the right to present additional or alternative explanations of infringement for the claim and functionalities identified below and for other claims and functionalities of the Accused Instrumentalities.

214.    For example, the Accused Instrumentalities infringe at least claim 23 of the '887 Patent. Claim 23 of the '887 Patent recites: "A computer-implemented method comprising: storing, in a computer database system, derived venue check-in data that is based on time-stamped

location data captured by a plurality of electronic location sensors, wherein the plurality of electronic location sensors that capture time-stamped location data indicative of the location that venue visitors visit over time, such that the derived venue check-in data comprises venue check-in data from multiple venue visitors for multiple venues in a geographic region." Uber performs this step of the claimed method.

215.    For example, as described above, Uber provides the Uber application. *See, e.g., supra* at § V.

216.    Uber's riders and providers access the Uber application on mobile computing devices with electronic location sensors that capture time-stamped location data. *See, e.g., supra* at § V.

217.    Uber's riders and providers generate time-stamped location data, or event data, indicative of an H3 hexagon, when they request or accept a ride in the Uber application. *See, e.g., supra* at § V.

218.    Uber collects event data, including time-stamped location data, for multiple users in multiple hexagons in a geographic region and stores event data in a database. *See, e.g., supra* at § V.

219.    Claim 23 of the '887 Patent further recites: "generating, by one or more processors of a host computer system that is in communication with the computer database system, a check-in intensity vector for each of the multiple venues based on the venue check-in data, each check-in intensity vector comprising a plurality of elements, each element corresponding to one or more venue visitors of the multiple venue visitors, and wherein values for the elements of the check-in intensity vector for a venue is based on at least a measure of intensity of check-ins of the corresponding one or more venue visitors to the venue over a predetermined period of time;

generating, by the one or more processors, elements of a pairwise venue similarity matrix for the multiple venues that comprises a plurality of elements, each generated element comprising a similarity score indicative of a similarity between a different pair of the multiple venues, wherein the similarity score for a pair of the venues is determined, by the one or more processors, based on at least a measure of the similarity between the check-in intensity vectors for each of the pair of venues; determining, by the one or more processors, boundaries for two or more geographic clusters of venues in the geographic region, wherein the geographic clusters of venues are determined based on at least the generated elements of the pairwise venue similarity matrix, wherein each of the two or more geographic clusters of venues comprises a mix of one or more venues." Uber performs this step of the claimed method.

220.    For example, Uber uses a computer system comprising one or more processors in communication with the computer database system to identify two or more hexclusters based on similarities in the event data. *See, e.g., supra* at § V.[59]



---

[59] *See* https://www.youtube.com/watch?v=aCj-YVZ0mlE at 3:50–4:28 ("We use a lot of historical trip data and feed it as inputs to the hierarchical clustering algorithm that conglomerates [] hexagons into larger and larger clusters."). *See also, e.g., supra* at § V.



221.    Uber uses hexclusters of H3 hexagons to forecast demand, determine driver incentives, and set pricing models (including surge pricing). *See, e.g.*, *supra* at § V.

222.    When determining whether to cluster one H3 hexagon with another for purposes of forecasting demand, determining driver incentives, and setting pricing models, Uber retrieves historical rider and provider location data. *See, e.g.*, *supra* at § V.

223.    Uber generates a check-in intensity vector for each hexagon based on event data when, for example, it forecasts supply and demand for surge pricing. *See, e.g.*, *supra* at § V. The check-in intensity vectors comprise a plurality of elements, where each element corresponds to one or more venue visitors, based on the intensity of the historical check-ins to a hexagon. *Id.* Uber generates a pairwise venue similarity matrix using this information. *Id.*[60]

---

[60] *See* https://www.youtube.com/watch?v=kRqFn7jAsoo at 12:04–35 ("so that's the basic idea of how similarity is defined . . . all right so with that we can apply this embedding framework to our hexagons and eventually we ended up with a matrix, that's not really a matrix, a table, that for each hexagon UID, we have this is a 50 dimensional real number to describe this hexagon . . . we can then apply clustering methodologies."). *See also* https://www.youtube.com /watch?v=aCj-YVZ0mlE at 3:50–4:28 ("We use a lot of historical trip data and feed it as inputs to the hierarchical clustering algorithm that conglomerates [] hexagons into larger and larger clusters.").





224.    Uber calculates metrics for each hexagon using event data, including location data, describing a type of rider behavior in a hexagon, a type of provider behavior in a hexagon, or some combination of rider and provider behavior, and Uber uses these metrics to identify similarities between hexagons. *See, e.g.*, *supra* at § V.

225.    Uber generates a similarity score for every possible pair of hexagon clusters. Each similarity score is a measure of the overall level of similarity between the two clusters in the pair, and each similarity score is generated by combining one or more similarity components. Each similarity component represents a different aspect of similarity between the two clusters. *See, e.g.*, *supra* at § V.

226.    The similarity scores are saved to an association table that associates each similarity score to the corresponding cluster pair. *See, e.g.*, *supra* at § V.

227.    In the same way, Uber generates a similarity score between individual hexagons and saves the similarity scores to an association table that associates each similarity score to the corresponding hexagon pair. *See, e.g.*, *supra* at § V.

228.    As described above, Uber utilizes hierarchical clustering when creating hexclusters. Uber calculates the pairwise distance between hexagons and their Ward linkage to determine whether a pair of hexagons should be clustered. Likewise, Uber segments hexclusters to achieve the desired granularity. *See, e.g.*, *supra* at § V.

229.    Uber clusters H3 hexagons together and determines the boundaries of hexclusters based on similarities in the event data. *See, e.g.*, *supra* at § V.

230.    Claim 23 of the '887 Patent further recites: "transmitting, by the host computer system to an analytics server system that is in communication with the host computer system via an electronic data network, the two or more geographic clusters determined by the host computer system such that the analytics server system is capable of providing analytics using the two or more geographic clusters determined by the host computer system." Uber performs this step of the claimed method.

231.    For example, Uber uses an analytics server system in communication with the host computer system via an electronic data network to manage hexclusters generated by the host computer system. *See, e.g.*, *supra* at § V.[61]

---

[61] *See, e.g.*, https://www.youtube.com/watch?v=aCj-YVZ0mlE at 3:42–57 ("There's two components, that are the generation platform and the serving and management platform"); *supra* at § V.



232.    Additionally, Uber uses an analytics server system to update hexclusters in real-time. *See, e.g.*, *supra* at § V.[62]

233.    Furthermore, as described above, Uber tests its hexcluster system for development and quality of service purposes. *See, e.g.*, *supra* at § V.

234.    Accordingly, Uber directly infringes, literally and/or under the doctrine of equivalents, the claims of the '887 Patent under 35 U.S.C. § 271(a).

235.    In addition or in the alternative, the Uber Freight Companies perform the claimed method of the '887 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g.*, *supra* at § V.

236.    As described above, Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US. *See, e.g.*, *supra* at § V.

---

[62] *See* https://www.uber.com/blog/gairos-scalability/ (indicating that Uber uses real-time data to inform its demand/supply forecasting and surge pricing); https://www.youtube.comwatch?v=aCj-YVZ0mlE at 4:16–28 ("We use a lot of historical trip data and feed it as inputs to the hierarchical clustering algorithm that conglomerates [] hexagons into larger and larger clusters.") (indicating the use of Cluster Management and Cluster Generation components in the Uber Hexclustering system). *See also, e.g.*, *supra* at §V.

237. As described above, the Uber Freight Companies test the hexcluster system for development and quality of service purposes. *See, e.g.*, *supra* at § V.

238. Accordingly, the Uber Freight Companies directly infringe, literally and/or under the doctrine of equivalents, the claims of the '887 Patent under 35 U.S.C. § 271(a).

239. As described above, Uber is vicariously liable for the Uber Freight Companies' infringement of the '887 Patent. *See, e.g.*, *supra* at § V.

240. In addition or in the alternative, Tupelo and/or Freight US perform the claimed method of the '887 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g.*, *supra* at § V.

241. Accordingly, Tupelo and/or Freight US directly infringe, literally and/or under the doctrine of equivalents, the claims of the '887 Patent under 35 U.S.C. § 271(a).

242. As described above, Freight Holding is vicariously liable for Tupelo and Freight US' infringement of the '887 Patent. *See, e.g.*, *supra* at § V.

243. In addition or in the alternative, Freight US performs the claimed method of the '887 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g.*, *supra* at § V.

244. Accordingly, Freight US directly infringes, literally and/or under the doctrine of equivalents, the claims of the '887 Patent under 35 U.S.C. § 271(a).

245. As described above, Tupelo is vicariously liable for Freight US' infringement of the '887 Patent. *See, e.g.*, *supra* at § V.

246. In addition or in the alternative, Freight LLC performs the claimed method of the '887 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g.*, *supra* at § V.

247. Accordingly, Freight LLC directly infringes, literally and/or under the doctrine of equivalents, the claims of the '887 Patent under 35 U.S.C. § 271(a).

248. As described above, Freight Holding and/or Tupelo are vicariously liable for Freight LLC's infringement of the '887 Patent. *See, e.g.*, *supra* at § V.

249. In addition or in the alternative, other Uber partners perform the claimed method of the '887 Patent in the same or a similar manner. *See, e.g.*, *supra* at § V.

250. Accordingly, other Uber partners directly infringe, literally and/or under the doctrine of equivalents, the claims of the '887 Patent under 35 U.S.C. § 271(a).

251. As described above, Uber is vicariously liable for other Uber partners' infringement of the '887 Patent. *See, e.g.*, *supra* at § V.

252. In addition or in the alternative, other Uber Freight partners perform the claimed method of the '887 Patent in the same or a similar manner. *See, e.g.*, *supra* at § V.

253. Accordingly, other Uber Freight partners directly infringe, literally and/or under the doctrine of equivalents, the claims of the '887 Patent under 35 U.S.C. § 271(a).

254. As described above, the Uber Freight Companies are vicariously liable for other Uber Freight partners' infringement of the '887 Patent. *See, e.g.*, *supra* at § V.

255. In addition or in the alternative, Uber directs or controls the Uber Freight Companies' infringing acts by conditioning the Uber Freight Companies' participation in and receipt of the benefit of offering and using the Uber Platform upon performance of infringing activity and establishes the manner and timing of that performance.

256. For example, Uber establishes the manner and timing of the Uber Freight Companies' storage of derived venue check-in data based on time-stamped location data captured by a plurality of electronic location sensors. As described above, Uber owns the Uber Freight application and Uber Freight website, and carriers or drivers on Uber Freight are required to share their time-stamped location data prior to booking a load or haul. *See, e.g.*, *supra* at § V. Uber

conditions the benefit of using the Uber Freight application and website on the Uber Freight Companies storing derived venue check-in data. Therefore, the Uber Freight Companies' infringing acts are attributable to Uber.

257.    In addition or in the alternative, Uber establishes the manner and timing of the Uber Freight Companies' performance of additional method steps. As described above, Uber owns the Uber Freight application and Uber Freight website, and Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US. *See, e.g.*, *supra* at § V. Uber conditions the benefit of using the Uber Freight application and website on the Uber Freight Companies using Uber's technology stack, including the hexclustering system. Therefore, the Uber Freight Companies' infringing acts are attributable to Uber.

258.    In addition or in the alternative, the Uber Freight Companies direct or control Uber's infringing acts with respect to Uber Freight by conditioning Uber's participation in and receipt of the benefit of offering Uber Freight upon performance of infringing activity and establishes the manner and timing of that performance.

259.    For example, the Uber Freight Companies establish the manner and timing of Uber's collection and storage of derived venue check-in data based on time-stamped location data captured by a plurality of electronic location sensors. As described above, Uber owns the Uber Freight application and Uber Freight website, and carriers or drivers on Uber Freight are required to share their time-stamped location data prior to booking a load or haul. *See, e.g.*, *supra* at § V. The Uber Freight Companies condition the benefit of offering Uber Freight on Uber storing derived venue check-in data. Therefore, Uber's infringing acts with respect to Uber Freight are attributable to the Uber Freight Companies.

47

260. In addition or in the alternative, the Uber Freight Companies establish the manner and timing of Uber's performance of additional method steps. As described above, Uber owns the Uber Freight application and Uber Freight website, and Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US. *See, e.g., supra* at § V. The Uber Freight Companies condition the benefit of offering Uber Freight on Uber providing its technology stack, including the hexclustering system. Therefore, Uber's infringing acts with respect to Uber Freight are attributable to the Uber Freight Companies.

261. In addition or in the alternative, Uber directs or controls other Uber partners' infringing acts by conditioning other Uber partners' receipt of certain benefits upon performance of infringing activity and establishes the manner and timing of that performance.

262. For example, Uber establishes the manner and timing of other Uber partners' collection, processing, storage, and retrieval of derived venue check-in data. Therefore, other Uber partners' infringing acts are attributable to Uber.

263. In addition or in the alternative, the Uber Freight Companies direct or control other Uber Freight partners' infringing acts by conditioning other Uber Freight partners' receipt of certain benefits upon performance of infringing activity and establishes the manner and timing of that performance.

264. For example, the Uber Freight Companies establish the manner and timing of other Uber Freight partners' collection, processing, storage, and retrieval of derived venue check-in data. Therefore, other Uber Freight partners' infringing acts are attributable to the Uber Freight Companies.

265. In addition or in the alternative, Uber has indirectly infringed the claims of the '887 Patent under 35 U.S.C. § 271(b) and (c).

266.   Uber received actual notice of its infringement of the '887 Patent at least as of the date of service of this Complaint.

267.   Uber has induced and contributed to the infringement of others, including the Uber Freight Companies and other Uber partners.

268.   For example, Uber's advertising, sales, design, development, and/or technical materials related to operation of the Uber Platform contain and continue to contain instructions, directions, suggestion, and/or invitations that invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause the Uber Freight Companies and other Uber partners to directly infringe at least one claim of '887 Patent, either literally or under the doctrine of equivalents. *See, e.g.*, *supra* at § V.

269.   Additionally, Uber has induced infringement by the Uber Freight Companies, for example, by requiring the Uber Freight Companies to use or providing to the Uber Freight Companies for use the hexclustering system to forecast supply and demand, determine driver incentives, and set pricing models, encouraging the Uber Freight Companies to perform this method within the United States, requiring the Uber Freight Companies' customers to use the Uber Freight application or website in order to obtain or provide an Uber Freight delivery, and/or instructing, dictating, or training the Uber Freight Companies to perform the infringing method. *See, e.g.*, *supra* at §V.

270.   In addition, Uber invites, entices, leads on, influences, encourages, prevails on, moves by persuasion, and/or causes the Uber Freight Companies to use the hexclustering system to forecast supply and demand, determine driver incentives, and set pricing models. *See, e.g.*, *supra* at § V.

271.    Additionally, Uber has induced infringement by other Uber partners, for example, by contractually requiring, specifying, or directing other Uber partners to host, process, run, or operate software and network components that use or enable the use of the hexclustering system when Uber forecasts supply and demand, determines driver incentives, and sets pricing models; encouraging other Uber partners to perform this method within the United States; and/or instructing, dictating, or training other Uber partners to perform the infringing method. *See, e.g., supra* at § V.

272.    In addition, Uber invites, entices, leads on, influences, encourages, prevails on, moves by persuasion, and/or causes other Uber partners to host, process, run, or operate software and network components that use or enable the use of the hexclustering system when Uber forecasts supply and demand, determines driver incentives, and sets pricing models. *See, e.g., supra* at § V.

273.    Additionally, Uber has contributed to the Uber Freight Companies' infringement by selling or offering to sell in the United States a material or apparatus that is a component for use in practicing the patented method of the '887 Patent, where the component is a material part of the patented method, Uber knew that the component was especially made or adapted for use in a manner that would infringe the '887 Patent when Uber sold or offered to sell the component, and the component was not a staple article of commerce capable of substantial non-infringing use.

274.    For example, Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US for use in forecasting supply and demand, determining driver incentives, and setting pricing models. *See, e.g., supra* at § V.

275.    Uber's hexclustering system is a material part of the patented method and is especially made or adapted for performance of the infringing method with no substantial non-infringing uses.

276.    Uber took the above actions intending to cause infringing acts by others and/or it willfully blinded itself as to the existence of the '887 Patent and the Accused Instrumentalities' infringement thereof.

277.    Additionally, Uber has contributed to other Uber partners' infringement by selling or offering to sell in the United States a material or apparatus that is a component for use in practicing the patented method of the '887 Patent, where the component is a material part of the patented method, Uber knew that the component was especially made or adapted for use in a manner that would infringe the '887 Patent when Uber sold or offered to sell the component, and the component was not a staple article of commerce capable of substantial non-infringing use.

278.    For example, Uber provides software or network components of its hexclustering system to other Uber partners for use when Uber forecasts supply and demand, determines driver incentives, and sets pricing models.

279.    The software or network components of Uber's hexclustering system are a material part of the patented method and are especially made or adapted for performance of the infringing method with no substantial non-infringing uses.

280.    Uber took the above actions intending to cause infringing acts by others and/or it willfully blinded itself as to the existence of the '887 Patent and the Accused Instrumentalities' infringement thereof.

281.    Accordingly, Uber has indirectly infringed the claims of the '887 Patent under 35 U.S.C. § 271(b) and (c).

282.    In addition or in the alternative, the Uber Freight Companies have indirectly infringed the claims of the '887 Patent under 35 U.S.C. § 271(b) and (c).

283.    The Uber Freight Companies received actual notice of their infringement of the '887 Patent at least as of the date of service of this Complaint.

284.    The Uber Freight Companies have induced and contributed to the infringement of others, including other Uber Freight partners.

285.    For example, the Uber Freight Companies' advertising, sales, design, development, and/or technical materials related to operation of Uber Freight contain and continue to contain instructions, directions, suggestion, and/or invitations that invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause other Uber Freight partners to directly infringe at least one claim of '887 Patent, either literally or under the doctrine of equivalents. *See, e.g.*, *supra* at § V.

286.    Additionally, the Uber Freight Companies have induced infringement by other Uber Freight partners, for example, by contractually requiring, specifying, or directing other Uber Freight partners to host, process, run, or operate software and network components that use or enable the use of the hexclustering system when the Uber Freight Companies forecast supply and demand, determine driver incentives, and set pricing models; encouraging other Uber Freight partners to perform this method within the United States; and/or instructing, dictating, or training other Uber Freight partners to perform the infringing method. *See, e.g.*, *supra* at § V.

287.    In addition, the Uber Freight Companies invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause other Uber Freight partners to host, process, run, or operate software and network components that use or enable the use of the

hexclustering system when the Uber Freight Companies forecast supply and demand, determine driver incentives, and set pricing models. *See, e.g.*, *supra* at § V.

288.     Additionally, the Uber Freight Companies have contributed to other Uber Freight partners' infringement by selling or offering to sell in the United States a material or apparatus that is a component for use in practicing the patented method of the '887 Patent, where the component is a material part of the patented method, the Uber Freight Companies knew that the component was especially made or adapted for use in a manner that would infringe the '887 Patent when the Uber Freight Companies sold or offered to sell the component, and the component was not a staple article of commerce capable of substantial non-infringing use.

289.     For example, the Uber Freight Companies provide software or network components of the hexclustering system to other Uber Freight partners for use when the Uber Freight Companies forecast supply and demand, determine driver incentives, and set pricing models.

290.     The software or network components of the hexclustering system are a material part of the patented method and are especially made or adapted for performance of the infringing method with no substantial non-infringing uses.

291.     The Uber Freight Companies took the above actions intending to cause infringing acts by others and/or it willfully blinded itself as to the existence of the '887 Patent and the Accused Instrumentalities' infringement thereof.

292.     Accordingly, the Uber Freight Companies have indirectly infringed the claims of the '887 Patent under 35 U.S.C. § 271(b) and (c).

293.     Plaintiff reserves the right to identify any other claims of the '887 Patent that Defendants infringe in the disclosure of infringement contentions in this action. Furthermore, further discovery may reveal additional infringing products or services.

294.    Defendants received actual notice of their infringement of the '887 Patent at least as of the date of service of this Complaint.

295.    Defendants' ongoing infringement is willful.

296.    Defendants' infringement of the '887 Patent has damaged and will continue to damage CMU. CMU is entitled to recover damages adequate to compensate it for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants.

297.    As a matter of law, the notice provisions of 35 U.S.C. § 287 do not apply in this case for the '887 Patent, and therefore CMU has satisfied its obligations under 35 U.S.C. § 287 with respect to the '887 Patent.

## COUNT II: INFRINGEMENT OF THE '672 PATENT

298.    Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

299.    Defendants have willfully infringed and continue to willfully infringe the '672 Patent.

300.    Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '672 Patent under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell the Accused Instrumentalities in this District and elsewhere in the United States.

301.    CMU provides the following explanation of infringement with regard to an exemplary claim compared to an exemplary functionality. CMU reserves the right to present additional or alternative explanations of infringement for the claim and functionalities identified below and for other claims and functionalities of the Accused Instrumentalities.

302. For example, the Accused Instrumentalities infringe at least claim 21 of the '672 Patent. Claim 21 of the '672 Patent recites: "A computer-implemented method comprising: storing, in a computer database system, derived venue check-in data based on time-stamped location data captured by a plurality of electronic location sensors, wherein the venue check-in data comprise venue check-in data from multiple venue visitors for multiple venues in a geographic region and wherein the check-in data from the venue visitors comprises check-in time data." Uber performs this step of the claimed method.

303. For example, as described above, Uber provides the Uber application. *See, e.g.,* *supra* at § V.

304. Uber's riders and providers access the Uber application on mobile computing devices with electronic location sensors that capture time-stamped location data. *See, e.g.,* *supra* at § V.

305. Uber's riders and providers generate time-stamped location data, or event data, indicative of an H3 hexagon, when they request or accept a ride in the Uber application. *See, e.g.,* *supra* at § V.

306. Uber collects event data, including time-stamped location data, for multiple users in multiple hexagons in a geographic region and stores event data in a database. *See, e.g.,* *supra* at § V.

307. Claim 21 of the '672 Patent further recites: "identifying, by a host computer system that comprises one or more processors of a computer system that is in communication with the computer database system, two or more geographic clusters of venues in the geographic region, wherein each of the two or more geographic clusters of venues comprises a mix of one or more venues, using statistical inference from a probability distribution, based on patterns of check-in

time in the venue check-in data, such that the mix of venues for each cluster is emblematic of one

of a predetermined number of temporal check-in pattern types." Uber performs this step of the

claimed method.

308.    For example, Uber uses a computer system comprising one or more processors in

communication with the computer database system to identify two or more hexclusters based on

similarities in the event data. *See, e.g.*, *supra* at §V.[63]



[63] *See* https://www.youtube.com/watch?v=aCj-YVZ0mlE at 3:50–4:28 ("We use a lot of historical trip data and feed it as inputs to the hierarchical clustering algorithm that conglomerates [] hexagons into larger and larger clusters.").



309.    Uber uses hexclusters of H3 hexagons to forecast demand, determine driver incentives, and set pricing models (including surge pricing). *See, e.g.*, *supra* at §V.

310.    When determining whether to cluster one H3 hexagon with another for purposes of forecasting demand, determining driver incentives, and setting pricing models, Uber retrieves historical rider and provider location data. *See, e.g.*, *supra* at §V.

311.    Uber calculates metrics for each hexagon using event data, including location data, describing a type of rider behavior in a hexagon, a type of provider behavior in a hexagon, or some combination of rider and provider behavior, and uses these metrics to identify similarities between hexagons. *See, e.g.*, *supra* at §V.

312.    Uber generates a similarity score for every possible pair of hexagon clusters. Each similarity score is a measure of the overall level of similarity between the two clusters in the pair, and each similarity score is generated by combining one or more similarity components. Each similarity component represents a different aspect of similarity between the two clusters. *See, e.g.*, *supra* at § V.

313.     The similarity scores are saved to an association table that associates each similarity score to the corresponding cluster pair. *See, e.g.*, *supra* at § V.

314.     In the same way, Uber generates a similarity score between individual hexagons and saves the similarity scores to an association table that associates each similarity score to the corresponding hexagon pair. *See, e.g.*, *supra* at § V.

315.     Uber clusters H3 hexagons together based on similarities in the event data to create hexclusters. *See, e.g.*, *supra* at § V.

316.     Resulting hexclusters are emblematic of one of a predetermined number of temporal check-in pattern types. *See, e.g.*, *supra* at §V.[64]



Figure 2. The maps above depict the process of bucketing points with H3: cars in a city; cars in hexagons; and hexagons shaded by number of cars.

---

[64] *See, e.g.*, https://www.uber.com/blog/h3/. *See also*, https://www.uber.com/blog/gairos-scalabil-ity/.



To calculate the surge multiplier for a hexagon defined by *H3*, the number of requests (demand) and the number of available drivers (supply) will be queried from Gairos to get the latest data. These data will be input to the pricing model and the pricing model will generate a surge multiplier for that location. Figure 5 shows surge multipliers in different hexagons around the stadium in Oakland when there was a game.

Figure 5: Surge multipliers for different hexagons in Oakland when there is a game.

317.    Uber's forecasting and pricing models are designed to account for temporal patterns and involve the use of statistical inferences from a probability distribution. *See, e.g.*, *supra* at § V.

318.    Claim 21 of the '672 Patent further recites: "transmitting, by the host computer system to an analytics server system that is in communication with the host computer system via an electronic data network, the two or more geographic clusters identified by the host computer system such that the analytics server system is capable of providing analytics using the two or more geographic clusters determined by the host computer system." Uber performs this step of the claimed method.

319.    For example, Uber uses an analytics server system in communication with the host computer system via an electronic data network to manage hexclusters generated by the host computer system. *See, e.g.*, *supra* at §V.[65]



320.    Additionally, Uber uses an analytics server system to update hexclusters in real-time. *See, e.g.*, *supra* at §V.[66]

321.    Accordingly, Uber directly infringes, literally and/or under the doctrine of equivalents, the claims of the '672 Patent under 35 U.S.C. § 271(a).

322.    In addition or in the alternative, the Uber Freight Companies perform the claimed method of the '672 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g.*, *supra* at § V.

---

[65] *See, e.g.*, https://www.youtube.com/watch?v=aCj-YVZ0mlE at 3:42–57 ("There's two components, that are the generation platform and the serving and management platform"); *supra* at § V.
[66] *See* https://www.uber.com/blog/gairos-scalability/ (indicating that Uber uses real-time data to inform its demand/supply forecasting and surge pricing); https://www.youtube.comwatch?v=aCj-YVZ0mlE at 4:16–28 ("We use a lot of historical trip data and feed it as inputs to the hierarchical clustering algorithm that conglomerates [] hexagons into larger and larger clusters.") (indicating the use of Cluster Management and Cluster Generation components in the Uber Hexclustering system). *See also, e.g.*, *supra* at § V.

323.    As described above, Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US. *See, e.g.*, *supra* at § V.

324.    As described above, the Uber Freight Companies test the hexcluster system for development and quality of service purposes. *See, e.g.*, *supra* at § V.

325.    Accordingly, the Uber Freight Companies directly infringe, literally and/or under the doctrine of equivalents, the claims of the '672 Patent under 35 U.S.C. § 271(a).

326.    As described above, Uber is vicariously liable for the Uber Freight Companies' infringement of the '672 Patent. *See, e.g.*, *supra* at § V.

327.    In addition or in the alternative, Tupelo and/or Freight US perform the claimed method of the '672 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g.*, *supra* at § V.

328.    Accordingly, Tupelo and/or Freight US directly infringe, literally and/or under the doctrine of equivalents, the claims of the '672 Patent under 35 U.S.C. § 271(a).

329.    As described above, Freight Holding is vicariously liable for Tupelo and Freight US' infringement of the '672 Patent. *See, e.g.*, *supra* at § V.

330.    In addition or in the alternative, Freight US performs the claimed method of the '672 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g.*, *supra* at § V.

331.    Accordingly, Freight US directly infringes, literally and/or under the doctrine of equivalents, the claims of the '672 Patent under 35 U.S.C. § 271(a).

332.    As described above, Tupelo is vicariously liable for Freight US' infringement of the '672 Patent. *See, e.g.*, *supra* at § V.

333.    In addition or in the alternative, Freight LLC performs the claimed method of the '672 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g.*, *supra* at § V.

61

334. Accordingly, Freight LLC directly infringes, literally and/or under the doctrine of equivalents, the claims of the '672 Patent under 35 U.S.C. § 271(a).

335. As described above, Freight Holding and/or Tupelo are vicariously liable for Freight LLC's infringement of the '672 Patent. *See, e.g.*, *supra* at § V.

336. In addition or in the alternative, other Uber partners perform the claimed method of the '672 Patent in the same or a similar manner. *See, e.g.*, *supra* at § V.

337. Accordingly, other Uber partners directly infringe, literally and/or under the doctrine of equivalents, the claims of the '672 Patent under 35 U.S.C. § 271(a).

338. As described above, Uber is vicariously liable for other Uber partners' infringement of the '672 Patent. *See, e.g.*, *supra* at § V.

339. In addition or in the alternative, other Uber Freight partners perform the claimed method of the '672 Patent in the same or a similar manner. *See, e.g.*, *supra* at § V.

340. Accordingly, other Uber Freight partners directly infringe, literally and/or under the doctrine of equivalents, the claims of the '672 Patent under 35 U.S.C. § 271(a).

341. As described above, the Uber Freight Companies are vicariously liable for other Uber Freight partners' infringement of the '672 Patent. *See, e.g.*, *supra* at § V.

342. In addition or in the alternative, Uber directs or controls the Uber Freight Companies' infringing acts by conditioning the Uber Freight Companies' participation in and receipt of the benefit of offering and using the Uber Platform upon performance of infringing activity and establishes the manner and timing of that performance.

343. For example, Uber establishes the manner and timing of the Uber Freight Companies' storage of derived venue check-in data based on time-stamped location data captured by a plurality of electronic location sensors. As described above, Uber owns the Uber Freight

application and Uber Freight website, and carriers or drivers on Uber Freight are required to share their time-stamped location data prior to booking a load or haul. *See, e.g.*, *supra* at § V. Uber conditions the benefit of using the Uber Freight application and website on the Uber Freight Companies storing derived venue check-in data. Therefore, the Uber Freight Companies' infringing acts are attributable to Uber.

344.   In addition or in the alternative, Uber establishes the manner and timing of the Uber Freight Companies' performance of additional method steps. As described above, Uber owns the Uber Freight application and Uber Freight website, and Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US. *See, e.g.*, *supra* at § V. Uber conditions the benefit of using the Uber Freight application and website on the Uber Freight Companies using Uber's technology stack, including the hexclustering system. Therefore, the Uber Freight Companies' infringing acts are attributable to Uber.

345.   In addition or in the alternative, the Uber Freight Companies direct or control Uber's infringing acts with respect to Uber Freight by conditioning Uber's participation in and receipt of the benefit of offering Uber Freight upon performance of infringing activity and establishes the manner and timing of that performance.

346.   For example, the Uber Freight Companies establish the manner and timing of Uber's collection and storage of derived venue check-in data based on time-stamped location data captured by a plurality of electronic location sensors. As described above, Uber owns the Uber Freight application and Uber Freight website, and carriers or drivers on Uber Freight are required to share their time-stamped location data prior to booking a load or haul. *See, e.g.*, *supra* at § V. The Uber Freight Companies condition the benefit of offering Uber Freight on Uber storing

derived venue check-in data. Therefore, Uber's infringing acts with respect to Uber Freight are attributable to the Uber Freight Companies.

347.    In addition or in the alternative, the Uber Freight Companies establish the manner and timing of Uber's performance of additional method steps. As described above, Uber owns the Uber Freight application and Uber Freight website, and Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US. *See, e.g.*, *supra* at § V. The Uber Freight Companies condition the benefit of offering Uber Freight on Uber providing its technology stack, including the hexclustering system. Therefore, Uber's infringing acts with respect to Uber Freight are attributable to the Uber Freight Companies.

348.    In addition or in the alternative, Uber directs or controls other Uber partners' infringing acts by conditioning other Uber partners' receipt of certain benefits upon performance of infringing activity and establishes the manner and timing of that performance.

349.    For example, Uber establishes the manner and timing of other Uber partners' collection, processing, storage, and retrieval of derived venue check-in data. Therefore, other Uber partners' infringing acts are attributable to Uber.

350.    In addition or in the alternative, the Uber Freight Companies direct or control other Uber Freight partners' infringing acts by conditioning other Uber Freight partners' receipt of certain benefits upon performance of infringing activity and establishes the manner and timing of that performance.

351.    For example, the Uber Freight Companies establish the manner and timing of other Uber Freight partners' collection, processing, storage, and retrieval of derived venue check-in data. Therefore, other Uber Freight partners' infringing acts are attributable to the Uber Freight Companies.

352. In addition or in the alternative, Uber has indirectly infringed the claims of the '672 Patent under 35 U.S.C. § 271(b) and (c).

353. Uber received actual notice of its infringement of the '672 Patent at least as of the date of service of this Complaint.

354. Uber has induced and contributed to the infringement of others, including the Uber Freight Companies and other Uber partners.

355. For example, Uber's advertising, sales, design, development, and/or technical materials related to operation of the Uber Platform contain and continue to contain instructions, directions, suggestion, and/or invitations that invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause the Uber Freight Companies and other Uber partners to directly infringe at least one claim of '672 Patent, either literally or under the doctrine of equivalents. *See, e.g., supra* at § V.

356. Additionally, Uber has induced infringement by the Uber Freight Companies, for example, by requiring the Uber Freight Companies to use or providing to the Uber Freight Companies for use the hexclustering system to forecast supply and demand, determine driver incentives, and set pricing models, encouraging the Uber Freight Companies to perform this method within the United States, requiring the Uber Freight Companies' customers to use the Uber Freight application or website in order to obtain or provide an Uber Freight delivery, and/or instructing, dictating, or training the Uber Freight Companies to perform the infringing method. *See, e.g., supra* at §V.

357. In addition, Uber invites, entices, leads on, influences, encourages, prevails on, moves by persuasion, and/or causes the Uber Freight Companies to use the hexclustering system

to forecast supply and demand, determine driver incentives, and set pricing models. *See, e.g.*, *supra* at § V.

358.    Additionally, Uber has induced infringement by other Uber partners, for example, by contractually requiring, specifying, or directing other Uber partners to host, process, run, or operate software and network components that use or enable the use of the hexclustering system when Uber forecasts supply and demand, determines driver incentives, and sets pricing models; encouraging other Uber partners to perform this method within the United States; and/or instructing, dictating, or training other Uber partners to perform the infringing method. *See, e.g.*, *supra* at § V.

359.    In addition, Uber invites, entices, leads on, influences, encourages, prevails on, moves by persuasion, and/or causes other Uber partners to host, process, run, or operate software and network components that use or enable the use of the hexclustering system when Uber forecasts supply and demand, determines driver incentives, and sets pricing models. *See, e.g.*, *supra* at § V.

360.    Additionally, Uber has contributed to the Uber Freight Companies' infringement by selling or offering to sell in the United States a material or apparatus that is a component for use in practicing the patented method of the '672 Patent, where the component is a material part of the patented method, Uber knew that the component was especially made or adapted for use in a manner that would infringe the '672 Patent when Uber sold or offered to sell the component, and the component was not a staple article of commerce capable of substantial non-infringing use.

361.    For example, Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US for use in forecasting supply and demand, determining driver incentives, and setting pricing models. *See, e.g.*, *supra* at § V.

362.    Uber's hexclustering system is a material part of the patented method and is especially made or adapted for performance of the infringing method with no substantial non-infringing uses.

363.    Uber took the above actions intending to cause infringing acts by others and/or it willfully blinded itself as to the existence of the '672 Patent and the Accused Instrumentalities' infringement thereof.

364.    Additionally, Uber has contributed to other Uber partners' infringement by selling or offering to sell in the United States a material or apparatus that is a component for use in practicing the patented method of the '672 Patent, where the component is a material part of the patented method, Uber knew that the component was especially made or adapted for use in a manner that would infringe the '672 Patent when Uber sold or offered to sell the component, and the component was not a staple article of commerce capable of substantial non-infringing use.

365.    For example, Uber provides software or network components of its hexclustering system to other Uber partners for use when Uber forecasts supply and demand, determines driver incentives, and sets pricing models.

366.    The software or network components of Uber's hexclustering system are a material part of the patented method and are especially made or adapted for performance of the infringing method with no substantial non-infringing uses.

367.    Uber took the above actions intending to cause infringing acts by others and/or it willfully blinded itself as to the existence of the '672 Patent and the Accused Instrumentalities' infringement thereof.

368.    Accordingly, Uber has indirectly infringed the claims of the '672 Patent under 35 U.S.C. § 271(b) and (c).

369.    In addition or in the alternative, the Uber Freight Companies have indirectly infringed the claims of the '672 Patent under 35 U.S.C. § 271(b) and (c).

370.    The Uber Freight Companies received actual notice of their infringement of the '672 Patent at least as of the date of service of this Complaint.

371.    The Uber Freight Companies have induced and contributed to the infringement of others, including other Uber Freight partners.

372.    For example, the Uber Freight Companies' advertising, sales, design, development, and/or technical materials related to operation of Uber Freight contain and continue to contain instructions, directions, suggestion, and/or invitations that invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause other Uber Freight partners to directly infringe at least one claim of '672 Patent, either literally or under the doctrine of equivalents. *See, e.g.*, *supra* at § V.

373.    Additionally, the Uber Freight Companies have induced infringement by other Uber Freight partners, for example, by contractually requiring, specifying, or directing other Uber Freight partners to host, process, run, or operate software and network components that use or enable the use of the hexclustering system when the Uber Freight Companies forecast supply and demand, determine driver incentives, and set pricing models; encouraging other Uber Freight partners to perform this method within the United States; and/or instructing, dictating, or training other Uber Freight partners to perform the infringing method. *See, e.g.*, *supra* at § V.

374.    In addition, the Uber Freight Companies invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause other Uber Freight partners to host, process, run, or operate software and network components that use or enable the use of the

68

hexclustering system when the Uber Freight Companies forecast supply and demand, determine driver incentives, and set pricing models. *See, e.g.*, *supra* at § V.

375. Additionally, the Uber Freight Companies have contributed to other Uber Freight partners' infringement by selling or offering to sell in the United States a material or apparatus that is a component for use in practicing the patented method of the '672 Patent, where the component is a material part of the patented method, the Uber Freight Companies knew that the component was especially made or adapted for use in a manner that would infringe the '672 Patent when the Uber Freight Companies sold or offered to sell the component, and the component was not a staple article of commerce capable of substantial non-infringing use.

376. For example, the Uber Freight Companies provide software or network components of the hexclustering system to other Uber Freight partners for use when the Uber Freight Companies forecast supply and demand, determine driver incentives, and set pricing models.

377. The software or network components of the hexclustering system are a material part of the patented method and are especially made or adapted for performance of the infringing method with no substantial non-infringing uses.

378. The Uber Freight Companies took the above actions intending to cause infringing acts by others and/or it willfully blinded itself as to the existence of the '672 Patent and the Accused Instrumentalities' infringement thereof.

379. Accordingly, the Uber Freight Companies have indirectly infringed the claims of the '672 Patent under 35 U.S.C. § 271(b) and (c).

380. Plaintiff reserves the right to identify any other claims of the '672 Patent that Defendants infringe in the disclosure of infringement contentions in this action. Furthermore, further discovery may reveal additional infringing products or services.

381.    Defendants received actual notice of their infringement of the '672 Patent at least as of the date of service of this Complaint.

382.    Defendants' ongoing infringement is willful.

383.    Defendants' infringement of the '672 Patent has damaged and will continue to damage CMU. CMU is entitled to recover damages adequate to compensate it for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants.

384.    As a matter of law, the notice provisions of 35 U.S.C. § 287 do not apply in this case for the '672 Patent, and therefore CMU has satisfied its obligations under 35 U.S.C. § 287 with respect to the '672 Patent.

## COUNT III: INFRINGEMENT OF THE '349 PATENT

385.    Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

386.    Defendants have willfully infringed and continue to willfully infringe the '349 Patent.

387.    Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '349 Patent under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell the Accused Instrumentalities in this District and elsewhere in the United States.

388.    CMU provides the following explanation of infringement with regard to an exemplary claim compared to an exemplary functionality. CMU reserves the right to present additional or alternative explanations of infringement for the claim and functionalities identified below and for other claims and functionalities of the Accused Instrumentalities.

70

389.    For example, the Accused Instrumentalities infringe at least claim 11 of the '349 Patent. Claim 11 of the '349 Patent recites: "A computer-implemented method comprising: retrieving, from a venue data store database, venue check-in data captured by a plurality of location indicators, the check-in data indicative of venues visited by a plurality of venue visitors." Uber performs this step of the claimed method.

390.    For example, as described above, Uber provides the Uber application. *See, e.g., supra* at § V.

391.    Uber's riders and providers access the Uber application on mobile computing devices with location indicators that capture time-stamped location data. *See, e.g., supra* at § V.

392.    Uber's riders and providers generate time-stamped location data, or event data, indicative of an H3 hexagon, when they request or accept a ride in the Uber application. *See, e.g., supra* at § V.

393.    Uber collects event data, including time-stamped location data, for multiple users in multiple hexagons in a geographic region and stores event data in and retrieves event data from a database. *See, e.g., supra* at § V.

394.    Claim 11 of the '349 Patent recites: "calculating a social similarity score between venues in each of one or more pairs of venues in the plurality of venues, wherein the social similarity score is based on a commonalities in the check-in data for each venue." Uber performs this step of the claimed method.

395.    For example, Uber calculates metrics for each hexagon using event data, including location data, describing a type of rider behavior in a hexagon, a type of provider behavior in a hexagon, or some combination of rider and provider behavior, and uses these metrics to identify similarities between hexagons. *See, e.g., supra* at § V.

396.    Uber generates a similarity score for every possible pair of hexagon clusters. Each similarity score is a measure of the overall level of similarity between the two clusters in the pair, and each similarity score is generated by combining one or more similarity components. Each similarity component represents a different aspect of similarity between the two clusters. *See, e.g.*, *supra* at § V.

397.    The similarity scores are saved to an association table that associates each similarity score to the corresponding cluster pair. *See, e.g.*, *supra* at § V.

398.    In the same way, Uber generates a similarity score between individual hexagons and saves the similarity scores to an association table that associates each similarity score to the corresponding hexagon pair. *See, e.g.*, *supra* at § V.

399.    Claim 11 of the '349 Patent recites: "identifying a neighborhood cluster comprising a plurality of venues based on the social similarity scores between pairs of venues." Uber performs this step of the claimed method.

400.    As described above, Uber clusters H3 hexagons together based on similarities in the event data to create hexclusters. *See, e.g.*, *supra* at § V.

401.    Furthermore, Uber measures the number of requests (demand) and the number of available drivers (supply) in hexagons in each city that Uber operates. *See, e.g.*, *supra* at § V.[67]

402.    Uber uses hexclusters of H3 hexagons to forecast demand, determine driver incentives, and set pricing models (including surge pricing). *See, e.g.*, *supra* at § V.

---

[67] *See, e.g.*, https://www.uber.com/blog/gairos-scalability/ ("To calculate the surge multiplier for a hexagon defined by H3, the number of requests (demand) and the number of available drivers (supply) will be queried from Gairos to get the latest data.); https://www.uber.com/blog/h3/ ("For example, we calculate surge pricing by measuring supply and demand in hexagons in each city that we serve."). *See also supra* at § V.

403. Accordingly, Uber directly infringes, literally and/or under the doctrine of equivalents, the claims of the '349 Patent under 35 U.S.C. § 271(a).

404. In addition or in the alternative, the Uber Freight Companies perform the claimed method of the '349 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g., supra* at § V.

405. As described above, Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US. *See, e.g., supra* at § V.

406. As described above, the Uber Freight Companies test the hexcluster system for development and quality of service purposes. *See, e.g., supra* at § V.

407. Accordingly, the Uber Freight Companies directly infringe, literally and/or under the doctrine of equivalents, the claims of the '349 Patent under 35 U.S.C. § 271(a).

408. As described above, Uber is vicariously liable for the Uber Freight Companies' infringement of the '349 Patent. *See, e.g., supra* at § V.

409. In addition or in the alternative, Tupelo and/or Freight US perform the claimed method of the '349 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g., supra* at § V.

410. Accordingly, Tupelo and/or Freight US directly infringe, literally and/or under the doctrine of equivalents, the claims of the '349 Patent under 35 U.S.C. § 271(a).

411. As described above, Freight Holding is vicariously liable for Tupelo and Freight US' infringement of the '349 Patent. *See, e.g., supra* at § V.

412. In addition or in the alternative, Freight US performs the claimed method of the '349 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g., supra* at § V.

413. Accordingly, Freight US directly infringes, literally and/or under the doctrine of equivalents, the claims of the '349 Patent under 35 U.S.C. § 271(a).

414. As described above, Tupelo is vicariously liable for Freight US' infringement of the '349 Patent. *See, e.g.*, *supra* at § V.

415. In addition or in the alternative, Freight LLC performs the claimed method of the '349 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g.*, *supra* at § V.

416. Accordingly, Freight LLC directly infringes, literally and/or under the doctrine of equivalents, the claims of the '349 Patent under 35 U.S.C. § 271(a).

417. As described above, Freight Holding and/or Tupelo are vicariously liable for Freight LLC's infringement of the '349 Patent. *See, e.g.*, *supra* at § V.

418. In addition or in the alternative, other Uber partners perform the claimed method of the '349 Patent in the same or a similar manner. *See, e.g.*, *supra* at § V.

419. Accordingly, other Uber partners directly infringe, literally and/or under the doctrine of equivalents, the claims of the '349 Patent under 35 U.S.C. § 271(a).

420. As described above, Uber is vicariously liable for other Uber partners' infringement of the '349 Patent. *See, e.g.*, *supra* at § V.

421. In addition or in the alternative, other Uber Freight partners perform the claimed method of the '349 Patent in the same or a similar manner. *See, e.g.*, *supra* at § V.

422. Accordingly, other Uber Freight partners directly infringe, literally and/or under the doctrine of equivalents, the claims of the '349 Patent under 35 U.S.C. § 271(a).

423. As described above, the Uber Freight Companies are vicariously liable for other Uber Freight partners' infringement of the '349 Patent. *See, e.g.*, *supra* at § V.

424. In addition or in the alternative, Uber directs or controls the Uber Freight Companies' infringing acts by conditioning the Uber Freight Companies' participation in and receipt of the benefit of offering and using the Uber Platform upon performance of infringing activity and establishes the manner and timing of that performance.

425. For example, Uber establishes the manner and timing of the Uber Freight Companies' collection, storage, and retrieval of venue check-in data captured by a plurality of location indicators. As described above, Uber owns the Uber Freight application and Uber Freight website, and carriers or drivers on Uber Freight are required to share their location data prior to booking a load or haul. *See, e.g.*, *supra* at § V. Uber conditions the benefit of using the Uber Freight application and website on the Uber Freight Companies storing and retrieving venue check-in data. Therefore, the Uber Freight Companies' infringing acts are attributable to Uber.

426. In addition or in the alternative, Uber establishes the manner and timing of the Uber Freight Companies' performance of additional method steps. As described above, Uber owns the Uber Freight application and Uber Freight website, and Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US. *See, e.g.*, *supra* at § V. Uber conditions the benefit of using the Uber Freight application and website on the Uber Freight Companies using Uber's technology stack, including the hexclustering system. Therefore, the Uber Freight Companies' infringing acts are attributable to Uber.

427. In addition or in the alternative, the Uber Freight Companies direct or control Uber's infringing acts with respect to Uber Freight by conditioning Uber's participation in and receipt of the benefit of offering Uber Freight upon performance of infringing activity and establishes the manner and timing of that performance.

75

428.    For example, the Uber Freight Companies establish the manner and timing of Uber's collection, storage, and retrieval of venue check-in data captured by a plurality of location indicators. As described above, Uber owns the Uber Freight application and Uber Freight website, and carriers or drivers on Uber Freight are required to share their time-stamped location data prior to booking a load or haul. *See, e.g.*, *supra* at § V. The Uber Freight Companies condition the benefit of offering Uber Freight on Uber storing and retrieving venue check-in data. Therefore, Uber's infringing acts with respect to Uber Freight are attributable to the Uber Freight Companies.

429.    In addition or in the alternative, the Uber Freight Companies establish the manner and timing of Uber's performance of additional method steps. As described above, Uber owns the Uber Freight application and Uber Freight website, and Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US. *See, e.g.*, *supra* at § V. The Uber Freight Companies condition the benefit of offering Uber Freight on Uber providing its technology stack, including the hexclustering system. Therefore, Uber's infringing acts with respect to Uber Freight are attributable to the Uber Freight Companies.

430.    In addition or in the alternative, Uber directs or controls other Uber partners' infringing acts by conditioning other Uber partners' receipt of certain benefits upon performance of infringing activity and establishes the manner and timing of that performance.

431.    For example, Uber establishes the manner and timing of other Uber partners' collection, processing, storage, and retrieval of venue check-in data. Therefore, other Uber partners' infringing acts are attributable to Uber.

432. In addition or in the alternative, the Uber Freight Companies direct or control other Uber Freight partners' infringing acts by conditioning other Uber Freight partners' receipt of certain benefits upon performance of infringing activity and establishes the manner and timing of that performance.

433. For example, the Uber Freight Companies establish the manner and timing of other Uber Freight partners' collection, processing, storage, and retrieval of venue check-in data. Therefore, other Uber Freight partners' infringing acts are attributable to the Uber Freight Companies.

434. In addition or in the alternative, Uber has indirectly infringed the claims of the '349 Patent under 35 U.S.C. § 271(b) and (c).

435. Uber received actual notice of its infringement of the '349 Patent at least as of the date of service of this Complaint.

436. Uber has induced and contributed to the infringement of others, including the Uber Freight Companies and other Uber partners.

437. For example, Uber's advertising, sales, design, development, and/or technical materials related to operation of the Uber Platform contain and continue to contain instructions, directions, suggestion, and/or invitations that invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause the Uber Freight Companies and other Uber partners to directly infringe at least one claim of '349 Patent, either literally or under the doctrine of equivalents. *See, e.g.*, *supra* at § V.

438. Additionally, Uber has induced infringement by the Uber Freight Companies, for example, by requiring the Uber Freight Companies to use or providing to the Uber Freight Companies for use the hexclustering system to forecast supply and demand, determine driver

incentives, and set pricing models, encouraging the Uber Freight Companies to perform this method within the United States, requiring the Uber Freight Companies' customers to use the Uber Freight application or website in order to obtain or provide an Uber Freight delivery, and/or instructing, dictating, or training the Uber Freight Companies to perform the infringing method. *See, e.g.*, *supra* at §V.

439.   In addition, Uber invites, entices, leads on, influences, encourages, prevails on, moves by persuasion, and/or causes the Uber Freight Companies to use the hexclustering system to forecast supply and demand, determine driver incentives, and set pricing models. *See, e.g.*, *supra* at § V.

440.   Additionally, Uber has induced infringement by other Uber partners, for example, by contractually requiring, specifying, or directing other Uber partners to host, process, run, or operate software and network components that use or enable the use of the hexclustering system when Uber forecasts supply and demand, determines driver incentives, and sets pricing models; encouraging other Uber partners to perform this method within the United States; and/or instructing, dictating, or training other Uber partners to perform the infringing method. *See, e.g.*, *supra* at § V.

441.   In addition, Uber invites, entices, leads on, influences, encourages, prevails on, moves by persuasion, and/or causes other Uber partners to host, process, run, or operate software and network components that use or enable the use of the hexclustering system when Uber forecasts supply and demand, determines driver incentives, and sets pricing models. *See, e.g.*, *supra* at § V.

442.   Additionally, Uber has contributed to the Uber Freight Companies' infringement by selling or offering to sell in the United States a material or apparatus that is a component for

use in practicing the patented method of the '349 Patent, where the component is a material part of the patented method, Uber knew that the component was especially made or adapted for use in a manner that would infringe the '349 Patent when Uber sold or offered to sell the component, and the component was not a staple article of commerce capable of substantial non-infringing use.

443.    For example, Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US for use in forecasting supply and demand, determining driver incentives, and setting pricing models. *See, e.g.*, *supra* at § V.

444.    Uber's hexclustering system is a material part of the patented method and is especially made or adapted for performance of the infringing method with no substantial non-infringing uses.

445.    Uber took the above actions intending to cause infringing acts by others and/or it willfully blinded itself as to the existence of the '349 Patent and the Accused Instrumentalities' infringement thereof.

446.    Additionally, Uber has contributed to other Uber partners' infringement by selling or offering to sell in the United States a material or apparatus that is a component for use in practicing the patented method of the '349 Patent, where the component is a material part of the patented method, Uber knew that the component was especially made or adapted for use in a manner that would infringe the '349 Patent when Uber sold or offered to sell the component, and the component was not a staple article of commerce capable of substantial non-infringing use.

447.    For example, Uber provides software or network components of its hexclustering system to other Uber partners for use when Uber forecasts supply and demand, determines driver incentives, and sets pricing models.

448.   The software or network components of Uber's hexclustering system are a material part of the patented method and are especially made or adapted for performance of the infringing method with no substantial non-infringing uses.

449.   Uber took the above actions intending to cause infringing acts by others and/or it willfully blinded itself as to the existence of the '349 Patent and the Accused Instrumentalities' infringement thereof.

450.   Accordingly, Uber has indirectly infringed the claims of the '349 Patent under 35 U.S.C. § 271(b) and (c).

451.   In addition or in the alternative, the Uber Freight Companies have indirectly infringed the claims of the '349 Patent under 35 U.S.C. § 271(b) and (c).

452.   The Uber Freight Companies received actual notice of their infringement of the '349 Patent at least as of the date of service of this Complaint.

453.   The Uber Freight Companies have induced and contributed to the infringement of others, including other Uber Freight partners.

454.   For example, the Uber Freight Companies' advertising, sales, design, development, and/or technical materials related to operation of Uber Freight contain and continue to contain instructions, directions, suggestion, and/or invitations that invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause other Uber Freight partners to directly infringe at least one claim of '349 Patent, either literally or under the doctrine of equivalents. *See, e.g.*, *supra* at § V.

455.   Additionally, the Uber Freight Companies have induced infringement by other Uber Freight partners, for example, by contractually requiring, specifying, or directing other Uber Freight partners to host, process, run, or operate software and network components that use or

enable the use of the hexclustering system when the Uber Freight Companies forecast supply and demand, determine driver incentives, and set pricing models; encouraging other Uber Freight partners to perform this method within the United States; and/or instructing, dictating, or training other Uber Freight partners to perform the infringing method. *See, e.g.*, *supra* at § V.

456.    In addition, the Uber Freight Companies invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause other Uber Freight partners to host, process, run, or operate software and network components that use or enable the use of the hexclustering system when the Uber Freight Companies forecast supply and demand, determine driver incentives, and set pricing models. *See, e.g.*, *supra* at § V.

457.    Additionally, the Uber Freight Companies have contributed to other Uber Freight partners' infringement by selling or offering to sell in the United States a material or apparatus that is a component for use in practicing the patented method of the '349 Patent, where the component is a material part of the patented method, the Uber Freight Companies knew that the component was especially made or adapted for use in a manner that would infringe the '349 Patent when the Uber Freight Companies sold or offered to sell the component, and the component was not a staple article of commerce capable of substantial non-infringing use.

458.    For example, the Uber Freight Companies provide software or network components of the hexclustering system to other Uber Freight partners for use when the Uber Freight Companies forecast supply and demand, determine driver incentives, and set pricing models.

459.    The software or network components of the hexclustering system are a material part of the patented method and are especially made or adapted for performance of the infringing method with no substantial non-infringing uses.

81

460.    The Uber Freight Companies took the above actions intending to cause infringing acts by others and/or it willfully blinded itself as to the existence of the '349 Patent and the Accused Instrumentalities' infringement thereof.

461.    Accordingly, the Uber Freight Companies have indirectly infringed the claims of the '349 Patent under 35 U.S.C. § 271(b) and (c).

462.    Plaintiff reserves the right to identify any other claims of the '349 Patent that Defendants infringe in the disclosure of infringement contentions in this action. Furthermore, further discovery may reveal additional infringing products or services.

463.    Defendants received actual notice of their infringement of the '349 Patent at least as of the date of service of this Complaint.

464.    Defendants' ongoing infringement is willful.

465.    Defendants' infringement of the '349 Patent has damaged and will continue to damage CMU. CMU is entitled to recover damages adequate to compensate it for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants.

466.    As a matter of law, the notice provisions of 35 U.S.C. § 287 do not apply in this case for the '349 Patent, and therefore CMU has satisfied its obligations under 35 U.S.C. § 287 with respect to the '349 Patent.

## COUNT IV: INFRINGEMENT OF THE '082 PATENT

467.    Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

468.    Defendants have willfully infringed and continue to willfully infringe the '082 Patent.

469.    Defendants have directly infringed and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '082 Patent under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell the Accused Instrumentalities in this District and elsewhere in the United States.

470.    CMU provides the following explanation of infringement with regard to an exemplary claim compared to an exemplary functionality. CMU reserves the right to present additional or alternative explanations of infringement for the claim and functionalities identified below and for other claims and functionalities of the Accused Instrumentalities.

471.    For example, the Accused Instrumentalities infringe at least claim 1 of the '082 Patent. Claim 1 of the '082 Patent recites: "A computer-implemented method comprising: retrieving, from a database, venue check-in data indicative of a physical presence of venue visitors at a plurality of venues and location data indicative of a geographic location of the venues." Uber performs this step of the claimed method.

472.    For example, as described above, Uber provides the Uber application. *See, e.g.,* *supra* at § V.

473.    Uber's riders and providers access the Uber application on mobile computing devices with electronic location sensors that capture time-stamped location data. *See, e.g., supra* at § V.

474.    Uber's riders and providers generate time-stamped location data, or event data, indicative of an H3 hexagon, when they request or accept a ride in the Uber application. *See, e.g., supra* at § V.

475.    H3 hexagons are mapped to and indicate specific geographic locations on the globe. *See, e.g., supra* at §V.

476. Uber collects event data, including time-stamped location data, for multiple users in multiple hexagons in a geographic region and stores event data in and retrieves event data from a database. *See, e.g.*, *supra* at § V.

477. Claim 1 of the '082 Patent further recites: "calculating a spatial proximity between pairs of the venues." Uber performs this step of the claimed method.

478. For example, when determining whether to cluster one H3 hexagon with another for purposes of forecasting demand, determining driver incentives, and setting pricing models, Uber considers whether hexagons are in close geographic proximity.[68] *See, e.g.*, *supra* at § V.

479. Claim 1 of the '082 Patent further recites: "determining, based on the venue check-in data, one or more groups of venue visitors that have visited one or more common venues." Uber performs this step of the claimed method.

480. For example, Uber measures the number of requests (demand) and the number of available drivers (supply) in hexagons in each city that Uber operates.[69] *See, e.g.*, *supra* at § V.

481. Claim 1 of the '082 Patent further recites: "calculating a social similarity score between pairs of venues, the social similarity score based, at least in part, on the determination that one or more groups of venue visitors have visited one or more common venues." Uber performs this step of the claimed method.

---

[68] *See, e.g.*, https://www.youtube.com/watch?v=kRqFn7jAsoo at 12:45–14:04 ("[Uber] want[s] to make sure that [it] can only cluster hexagons if they are neighboring to each other . . . one constraint that we reinforce is there should be connectivity . . . and then we merge—we cluster together the pair that gives us the smallest within cluster variance."). *See also supra* at §V.

[69] *See, e.g.*, https://www.uber.com/blog/gairos-scalability/ ("To calculate the surge multiplier for a hexagon defined by H3, the number of requests (demand) and the number of available drivers (supply) will be queried from Gairos to get the latest data.); https://www.uber.com/blog/h3/ ("For example, we calculate surge pricing by measuring supply and demand in hexagons in each city that we serve."). *See also supra* at § V.

482.    For example, Uber calculates metrics for each hexagon using event data, including location data, describing a type of rider behavior in a hexagon, a type of provider behavior in a hexagon, or some combination of rider and provider behavior, and uses these metrics to identify similarities between hexagons. *See, e.g.*, *supra* at § V.

483.    Uber generates a similarity score for every possible pair of hexagon clusters. Each similarity score is a measure of the overall level of similarity between the two clusters in the pair, and each similarity score is generated by combining one or more similarity components. Each similarity component represents a different aspect of similarity between the two clusters. *See, e.g.*, *supra* at § V.

484.    The similarity scores are saved to an association table that associates each similarity score to the corresponding cluster pair. *See, e.g.*, *supra* at § V.

485.    In the same way, Uber generates a similarity score between individual hexagons and saves the similarity scores to an association table that associates each similarity score to the corresponding hexagon pair. *See, e.g.*, *supra* at § V.

486.    Claim 1 of the '082 Patent further recites: "calculating an affinity score between the venues in the pairs of venues, the affinity score based on the social similarity score for the pair of venues and the spatial proximity between the venues in the pair; and identifying a neighborhood cluster of venues based on the affinity scores." Uber performs this step of the claimed method.

487.    As described above, Uber clusters H3 hexagons together based on similarities in the event data to create hexclusters. *See, e.g.*, *supra* at §V.

488.     Furthermore, when determining whether to cluster one H3 hexagon with another for purposes of forecasting demand, determining driver incentives, and setting pricing models, Uber considers whether hexagons are in close geographic proximity.[70] *See, e.g.*, *supra* at § V.

489.     Uber utilizes hierarchical clustering when creating hexclusters. Uber calculates the pairwise distance between hexagons and their Ward linkage to determine whether a pair of hexagons should be clustered. Likewise, Uber segments hexclusters to achieve the desired granularity. *See, e.g.*, *supra* at § V.

490.     Accordingly, Uber calculates an affinity score between hexagons based on social similarity and spatial proximity, and identifies a neighborhood cluster of venues based on the affinity score.

491.     Accordingly, Uber directly infringes, literally and/or under the doctrine of equivalents, the claims of the '082 Patent under 35 U.S.C. § 271(a).

492.     In addition or in the alternative, the Uber Freight Companies perform the claimed method of the '082 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g.*, *supra* at § V.

493.     As described above, Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US. *See, e.g.*, *supra* at § V.

494.     As described above, the Uber Freight Companies test the hexcluster system for development and quality of service purposes. *See, e.g.*, *supra* at § V.

---

[70] *See* https://www.youtube.com/watch?v=kRqFn7jAsoo at 12:45–14:04 ("[Uber] want[s] to make sure that [it] can only cluster hexagons if they are neighboring to each other . . . one constraint that we reinforce is there should be connectivity . . . and then we merge—we cluster together the pair that gives us the smallest within cluster variance.").

495. Accordingly, the Uber Freight Companies directly infringe, literally and/or under the doctrine of equivalents, the claims of the '082 Patent under 35 U.S.C. § 271(a).

496. As described above, Uber is vicariously liable for the Uber Freight Companies' infringement of the '082 Patent. *See, e.g.*, *supra* at § V.

497. In addition or in the alternative, Tupelo and/or Freight US perform the claimed method of the '082 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g.*, *supra* at § V.

498. Accordingly, Tupelo and/or Freight US directly infringe, literally and/or under the doctrine of equivalents, the claims of the '082 Patent under 35 U.S.C. § 271(a).

499. As described above, Freight Holding is vicariously liable for Tupelo and Freight US' infringement of the '082 Patent. *See, e.g.*, *supra* at § V.

500. In addition or in the alternative, Freight US performs the claimed method of the '082 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g.*, *supra* at § V.

501. Accordingly, Freight US directly infringes, literally and/or under the doctrine of equivalents, the claims of the '082 Patent under 35 U.S.C. § 271(a).

502. As described above, Tupelo is vicariously liable for Freight US' infringement of the '082 Patent. *See, e.g.*, *supra* at § V.

503. In addition or in the alternative, Freight LLC performs the claimed method of the '082 Patent in the same or a similar manner for Uber's Freight offerings. *See, e.g.*, *supra* at § V.

504. Accordingly, Freight LLC directly infringes, literally and/or under the doctrine of equivalents, the claims of the '082 Patent under 35 U.S.C. § 271(a).

505. As described above, Freight Holding and/or Tupelo are vicariously liable for Freight LLC's infringement of the '082 Patent. *See, e.g.*, *supra* at § V.

506. In addition or in the alternative, other Uber partners perform the claimed method of the '082 Patent in the same or a similar manner. *See, e.g.*, *supra* at § V.

507. Accordingly, other Uber partners directly infringe, literally and/or under the doctrine of equivalents, the claims of the '082 Patent under 35 U.S.C. § 271(a).

508. As described above, Uber is vicariously liable for other Uber partners' infringement of the '082 Patent. *See, e.g.*, *supra* at § V.

509. In addition or in the alternative, other Uber Freight partners perform the claimed method of the '082 Patent in the same or a similar manner. *See, e.g.*, *supra* at § V.

510. Accordingly, other Uber Freight partners directly infringe, literally and/or under the doctrine of equivalents, the claims of the '082 Patent under 35 U.S.C. § 271(a).

511. As described above, the Uber Freight Companies are vicariously liable for other Uber Freight partners' infringement of the '082 Patent. *See, e.g.*, *supra* at § V.

512. In addition or in the alternative, Uber directs or controls the Uber Freight Companies' infringing acts by conditioning the Uber Freight Companies' participation in and receipt of the benefit of offering and using the Uber Platform upon performance of infringing activity and establishes the manner and timing of that performance.

513. For example, Uber establishes the manner and timing of the Uber Freight Companies' collection, storage, and retrieval of venue check-in data. As described above, Uber owns the Uber Freight application and Uber Freight website, and carriers or drivers on Uber Freight are required to share their location data prior to booking a load or haul. *See, e.g.*, *supra* at § V. Uber conditions the benefit of using the Uber Freight application and website on the Uber Freight Companies storing and retrieving venue check-in data. Therefore, the Uber Freight Companies' infringing acts are attributable to Uber.

514. In addition or in the alternative, Uber establishes the manner and timing of the Uber Freight Companies' performance of additional method steps. As described above, Uber owns the Uber Freight application and Uber Freight website, and Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US. *See, e.g.*, *supra* at § V. Uber conditions the benefit of using the Uber Freight application and website on the Uber Freight Companies using Uber's technology stack, including the hexclustering system. Therefore, the Uber Freight Companies' infringing acts are attributable to Uber.

515. In addition or in the alternative, the Uber Freight Companies direct or control Uber's infringing acts with respect to Uber Freight by conditioning Uber's participation in and receipt of the benefit of offering Uber Freight upon performance of infringing activity and establishes the manner and timing of that performance.

516. For example, the Uber Freight Companies establish the manner and timing of Uber's collection, storage, and retrieval of venue check-in data. As described above, Uber owns the Uber Freight application and Uber Freight website, and carriers or drivers on Uber Freight are required to share their location data prior to booking a load or haul. *See, e.g.*, *supra* at § V. The Uber Freight Companies condition the benefit of offering Uber Freight on Uber storing and retrieving venue check-in data. Therefore, Uber's infringing acts with respect to Uber Freight are attributable to the Uber Freight Companies.

517. In addition or in the alternative, the Uber Freight Companies establish the manner and timing of Uber's performance of additional method steps. As described above, Uber owns the Uber Freight application and Uber Freight website, and Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US. *See, e.g.*, *supra* at § V. The Uber Freight Companies condition the benefit of offering Uber Freight on Uber providing its

technology stack, including the hexclustering system. Therefore, Uber's infringing acts with respect to Uber Freight are attributable to the Uber Freight Companies.

518. In addition or in the alternative, Uber directs or controls other Uber partners' infringing acts by conditioning other Uber partners' receipt of certain benefits upon performance of infringing activity and establishes the manner and timing of that performance.

519. For example, Uber establishes the manner and timing of other Uber partners' collection, processing, storage, and retrieval of venue check-in data. Therefore, other Uber partners' infringing acts are attributable to Uber.

520. In addition or in the alternative, the Uber Freight Companies direct or control other Uber Freight partners' infringing acts by conditioning other Uber Freight partners' receipt of certain benefits upon performance of infringing activity and establishes the manner and timing of that performance.

521. For example, the Uber Freight Companies establish the manner and timing of other Uber Freight partners' collection, processing, storage, and retrieval of venue check-in data. Therefore, other Uber Freight partners' infringing acts are attributable to the Uber Freight Companies.

522. In addition or in the alternative, Uber has indirectly infringed the claims of the '082 Patent under 35 U.S.C. § 271(b) and (c).

523. Uber received actual notice of its infringement of the '082 Patent at least as of the date of service of this Complaint.

524. Uber has induced and contributed to the infringement of others, including the Uber Freight Companies and other Uber partners.

525. For example, Uber's advertising, sales, design, development, and/or technical materials related to operation of the Uber Platform contain and continue to contain instructions, directions, suggestion, and/or invitations that invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause the Uber Freight Companies and other Uber partners to directly infringe at least one claim of '082 Patent, either literally or under the doctrine of equivalents. *See, e.g.*, *supra* at § V.

526. Additionally, Uber has induced infringement by the Uber Freight Companies, for example, by requiring the Uber Freight Companies to use or providing to the Uber Freight Companies for use the hexclustering system to forecast supply and demand, determine driver incentives, and set pricing models, encouraging the Uber Freight Companies to perform this method within the United States, requiring the Uber Freight Companies' customers to use the Uber Freight application or website in order to obtain or provide an Uber Freight delivery, and/or instructing, dictating, or training the Uber Freight Companies to perform the infringing method. *See, e.g.*, *supra* at §V.

527. In addition, Uber invites, entices, leads on, influences, encourages, prevails on, moves by persuasion, and/or causes the Uber Freight Companies to use the hexclustering system to forecast supply and demand, determine driver incentives, and set pricing models. *See, e.g.*, *supra* at § V.

528. Additionally, Uber has induced infringement by other Uber partners, for example, by contractually requiring, specifying, or directing other Uber partners to host, process, run, or operate software and network components that use or enable the use of the hexclustering system when Uber forecasts supply and demand, determines driver incentives, and sets pricing models; encouraging other Uber partners to perform this method within the United States; and/or

91

instructing, dictating, or training other Uber partners to perform the infringing method. *See, e.g.*, *supra* at § V.

529. In addition, Uber invites, entices, leads on, influences, encourages, prevails on, moves by persuasion, and/or causes other Uber partners to host, process, run, or operate software and network components that use or enable the use of the hexclustering system when Uber forecasts supply and demand, determines driver incentives, and sets pricing models. *See, e.g.*, *supra* at § V.

530. Additionally, Uber has contributed to the Uber Freight Companies' infringement by selling or offering to sell in the United States a material or apparatus that is a component for use in practicing the patented method of the '082 Patent, where the component is a material part of the patented method, Uber knew that the component was especially made or adapted for use in a manner that would infringe the '082 Patent when Uber sold or offered to sell the component, and the component was not a staple article of commerce capable of substantial non-infringing use.

531. For example, Uber licenses its technology stack, including its hexclustering system, to Freight LLC and Freight US for use in forecasting supply and demand, determining driver incentives, and setting pricing models. *See, e.g.*, *supra* at § V.

532. Uber's hexclustering system is a material part of the patented method and is especially made or adapted for performance of the infringing method with no substantial non-infringing uses.

533. Uber took the above actions intending to cause infringing acts by others and/or it willfully blinded itself as to the existence of the '082 Patent and the Accused Instrumentalities' infringement thereof.

534. Additionally, Uber has contributed to other Uber partners' infringement by selling or offering to sell in the United States a material or apparatus that is a component for use in practicing the patented method of the '082 Patent, where the component is a material part of the patented method, Uber knew that the component was especially made or adapted for use in a manner that would infringe the '082 Patent when Uber sold or offered to sell the component, and the component was not a staple article of commerce capable of substantial non-infringing use.

535. For example, Uber provides software or network components of its hexclustering system to other Uber partners for use when Uber forecasts supply and demand, determines driver incentives, and sets pricing models.

536. The software or network components of Uber's hexclustering system are a material part of the patented method and are especially made or adapted for performance of the infringing method with no substantial non-infringing uses.

537. Uber took the above actions intending to cause infringing acts by others and/or it willfully blinded itself as to the existence of the '082 Patent and the Accused Instrumentalities' infringement thereof.

538. Accordingly, Uber has indirectly infringed the claims of the '082 Patent under 35 U.S.C. § 271(b) and (c).

539. In addition or in the alternative, the Uber Freight Companies have indirectly infringed the claims of the '082 Patent under 35 U.S.C. § 271(b) and (c).

540. The Uber Freight Companies received actual notice of their infringement of the '082 Patent at least as of the date of service of this Complaint.

541. The Uber Freight Companies have induced and contributed to the infringement of others, including other Uber Freight partners.

542.    For example, the Uber Freight Companies' advertising, sales, design, development, and/or technical materials related to operation of Uber Freight contain and continue to contain instructions, directions, suggestion, and/or invitations that invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause other Uber Freight partners to directly infringe at least one claim of '082 Patent, either literally or under the doctrine of equivalents. *See, e.g.*, *supra* at § V.

543.    Additionally, the Uber Freight Companies have induced infringement by other Uber Freight partners, for example, by contractually requiring, specifying, or directing other Uber Freight partners to host, process, run, or operate software and network components that use or enable the use of the hexclustering system when the Uber Freight Companies forecast supply and demand, determine driver incentives, and set pricing models; encouraging other Uber Freight partners to perform this method within the United States; and/or instructing, dictating, or training other Uber Freight partners to perform the infringing method. *See, e.g.*, *supra* at § V.

544.    In addition, the Uber Freight Companies invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause other Uber Freight partners to host, process, run, or operate software and network components that use or enable the use of the hexclustering system when the Uber Freight Companies forecast supply and demand, determine driver incentives, and set pricing models. *See, e.g.*, *supra* at § V.

545.    Additionally, the Uber Freight Companies have contributed to other Uber Freight partners' infringement by selling or offering to sell in the United States a material or apparatus that is a component for use in practicing the patented method of the '082 Patent, where the component is a material part of the patented method, the Uber Freight Companies knew that the component was especially made or adapted for use in a manner that would infringe the '082 Patent when the

94

Uber Freight Companies sold or offered to sell the component, and the component was not a staple article of commerce capable of substantial non-infringing use.

546.    For example, the Uber Freight Companies provide software or network components of the hexclustering system to other Uber Freight partners for use when the Uber Freight Companies forecast supply and demand, determine driver incentives, and set pricing models.

547.    The software or network components of the hexclustering system are a material part of the patented method and are especially made or adapted for performance of the infringing method with no substantial non-infringing uses.

548.    The Uber Freight Companies took the above actions intending to cause infringing acts by others and/or it willfully blinded itself as to the existence of the '082 Patent and the Accused Instrumentalities' infringement thereof.

549.    Accordingly, the Uber Freight Companies have indirectly infringed the claims of the '082 Patent under 35 U.S.C. § 271(b) and (c).

550.    Plaintiff reserves the right to identify any other claims of the '082 Patent that Defendants infringe in the disclosure of infringement contentions in this action. Furthermore, further discovery may reveal additional infringing products or services.

551.    Defendants received actual notice of their infringement of the '082 Patent at least as of the date of service of this Complaint.

552.    Defendants' ongoing infringement is willful.

553.    Defendants' infringement of the '082 Patent has damaged and will continue to damage CMU. CMU is entitled to recover damages adequate to compensate it for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants.

554. As a matter of law, the notice provisions of 35 U.S.C. § 287 do not apply in this case for the '082 Patent, and therefore CMU has satisfied its obligations under 35 U.S.C. § 287 with respect to the '082 Patent.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Carnegie Mellon University respectfully requests the Court for an order granting the following relief:

a. A judgment in favor of Plaintiff that Defendants have infringed the '887, '672, '349, and '082 Patents;

b. A judgment and order finding that Defendants' infringement has been and continues to be willful;

c. A judgment and order requiring Defendants to pay Plaintiff its damages, costs, expenses, and any enhanced damages to which Plaintiff is entitled for Defendants' infringement;

d. A judgment and order requiring Defendants to pay supplemental damages to Plaintiff, including without limitation, pre-judgment and post-judgment interest;

e. A permanent injunction pursuant to 35 U.S.C. § 283 enjoining Defendants and any of its officers, directors, agents, employees, subsidiaries, affiliates, divisions, branches, parents, and/or those in association with them from further infringing the Patents-in-Suit during the duration of their term;

f. An order requiring Defendants to pay royalties for any un-enjoined post-judgment infringement.

96

g.      A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding Plaintiff its reasonable attorney fees against Defendants; and

h.      Any and all other relief as the Court may deem appropriate and just under the circumstances.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

_____

Brian P. Egan (#6227)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
began@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff*
*Carnegie Mellon University*

OF COUNSEL:

Bradley Caldwell
J. Austin Curry
Adrienne R. Dellinger
CALDWELL CASSADY & CURRY PC
2121 N. Pearl Street, Suite 1200
Dallas, TX  75201
(214) 888-4848

May 26, 2026

97